UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IKEDICHI NWOKORO,           )
                            )
         Plaintiff,         )
                            )
    v.                      )          Case No.:
                            )
GAWVT MOTORS, LLC,          )
d/b/a MALL OF GEORGIA FORD, )          1:17-cv-00225-MHC-AJB
BERKSHIRE HATHAWAY          )
AUTOMOTIVE, INC.,           )
d/b/a MALL OF GEORGIA FORD, )
VAN TUYL GROUP, LLC,        )
d/b/a MALL OF GEORGIA FORD, )
                            )
         Defendants.        )

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff Ikedichi Nwokoro brings this action against Defendants under 42

U.S.C. § 2000e and 42 U.S.C. § 1981 for racial discrimination, retaliation, and

creating and maintaining a hostile work environment. This amendment is made

pursuant to Rule 15(a)(1)(B) which allows a plaintiff to amend a complaint as a

matter of course within 21 days of the service of a responsive pleading.

1

*Parties*

1.    Plaintiff Ikedichi Nwokoro is a United States citizen, resident of Gwinnett County, and competent to bring this lawsuit. He is a former employee of Mall of Georgia Ford.

2.    Mall of Georgia Ford is a Ford dealership located at 4525 Nelson Brogdon Blvd NE, Buford, GA 30518.

3.    Defendant GAWVT Motors, LLC is a Delaware Limited Liability Company registered to do business in the State of Georgia.

4.    GAWVT Motors, LLC's registered the trade name Mall of Georgia Ford in the Gwinnett County Superior Court.

5.    The Georgia registered agent of GAWVT Motors, LLC is CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA 30361.

6.    Defendant Van Tuyl Group, LLC is a Delaware Limited Liability Company and the former owner of Mall of Georgia Ford dealership.

7.    Van Tuyl Group's registered agent is Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

2

8.      Defendant Berkshire Hathaway Automotive, Inc. is a Delaware

corporation registered to do business in the State of Georgia.

9.      Berkshire Hathaway Automotive's registered agent is Capital

Corporate Services, Inc. located at 3675 Crestwood Parkway, N.W.,

Suite 350, Duluth, GA 30096.

10.     In March 2015, Berkshire Hathaway Automotive, Inc., acquired or

assumed control of Van Tuyl Group, LLC, GAWVT Motors, LLC, and

the Mall of Georgia Ford dealership.

11.     Berkshire Hathaway Automotive, Inc. publicly holds itself out as the

owner of Mall of Georgia Ford, and its website lists Mall of Georgia

Ford as one of the dealerships it owns.

12.     Berkshire Hathaway Automotive is the legal successor-in-interest to

Van Tuyl Group, LLC and GAWVT Motors, LLC.

*Jurisdiction and Venue*

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331

because this case presents a federal question under 42 U.S.C. § 2000e.

14.     Upon service of process, this Court acquires personal jurisdiction of

the Defendants under Fed.R.Civ.P. 4(k)(1)(a).

15.    Venue is proper in the Northern District of Georgia under 28 U.S.C.

§§ 1391(b) and (d) because all actions complained of occurred within

the boundaries of this district and because the Defendants are deemed

residents of this District.

16.    All Defendants meet the statutory definition of "employer" under 42

U.S.C. § 2000e.

*Factual Background*

17.    Plaintiff is an African-American male who immigrated to the United

States from Nigeria and is a United States citizen.

18.    Plaintiff began working at Mall of Georgia Ford in September 2009 as

a sales consultant.

19.    The management team at Mall of Georgia Ford consist of the

following: Erik Conley, General Manager; Charles Aycock, Used Cars

Director; Eric Smith, Used Car Sales Manager.

20.    During his employment, Plaintiff reported directly to Eric Smith and

Charles Aycock.

4

21.     Ultimate hiring, firing, and decision-making authority at Mall of Georgia Ford rested with Erik Conley.

22.     During Plaintiff's employment, Plaintiff was one of the highest performing sales consultants within Mall of Georgia Ford.

23.     One of Plaintiff's supervisors, Charles Aycock, often requested that Plaintiff assist other sales people who were having trouble closing sales, and the managers at the dealership often asked Plaintiff to train new employees.

*Events Preceding Plaintiff's Termination – Filing of the EEOC Complaint*

24.     Plaintiff filed a complaint with the EEOC on March 27, 2014 as a result of the harassment and discrimination he faced during his employment.

25.     Upon information and belief, Erik Conley learned on April 2, 2014, that Plaintiff filed an EEOC complaint.

*Events Preceding Plaintiff's Termination – Monthly Sales Bonus Deduction*

26.     Each month at Mall of Georgia Ford, each sales consultant received a monthly sales bonus.

27. The monthly sales bonus was based on the employee's sales, as well as the employee's email capture rate (i.e., the number of in-person customers whose email address the employee obtained), and the employee's customer service interview (CSI) score (i.e., the rating given by customers who review their experience at their dealership).

28. Later, on April 2, 2014, Plaintiff learned that his monthly bonus for March 2014 amounted only to about $640. Based upon his sales performance and other statistics, Plaintiff expected to receive a monthly bonus of about $4,000.

29. Plaintiff learned of the issue with his bonus check from another employee who informed Plaintiff that "there is a problem with your bonus check." The employee stated, "you're not going to be too happy with your bonus; go take it up with [Erik] Conley."

30. The reduction in Plaintiff's bonus check was based on two purported justifications: Plaintiff's low CSI score, and Plaintiff's failure to obtain the email addresses of 75% of his in-person customers. Both of these justifications were false.

31.     The reason Erik Conley decided to reduce Plaintiff's bonus was to
        retaliate against Plaintiff due to his filing of an EEOC complaint, and
        to retaliate against Plaintiff for his previous complaints detailing
        workplace harassment and racism.

32.     After learning about his reduced bonus check, Plaintiff verified with
        the employee responsible for tracking the CSI and email capture rate
        that Plaintiff's statistics that were above the threshold set by the
        dealership, and that his check should not have been reduced.

33.     As a matter of company policy, if an employee believed that a bonus
        had been improperly calculated, they would be given an opportunity
        to prove the error and the bonus would be adjusted accordingly.

34.     Plaintiff then approached Conley and said he believed that there was a
        miscalculation with his bonus check. Erik Conley then invited
        Plaintiff into his office.

35.     Mr. Conley provided Plaintiff the reasons for the reduction in his
        bonus. The reasons given by Mr. Conley for the reduction of Plaintiff's
        monthly bonus were false. Plaintiff did not have a low CSI score and

did not fail to obtain at least 75% of the email addresses of his customers.

36.     Plaintiff stated that he disagreed with the calculation, and did not believe that the calculation was correct. Plaintiff informed Mr. Conley that he verified that his CSI and email capture rate were above the dealership's threshold for reducing a monthly bonus.

37.     Plaintiff said to Mr. Conley that he would go and get proof to back up Plaintiff's belief that his bonus was improperly calculated.

38.     Erik Conley responded by stating that Plaintiff's only options were to either accept the bonus payment or to resign. Conley said, "I'm done with you. If you don't like it, you can turn in your resignation."

39.     Erik Conley's demeanor was confrontational and hostile.

40.     Plaintiff then got up to leave Conley's office. As Plaintiff walked out of Conley's office, Plaintiff said to himself that he "cannot continue to take this kind of treatment."

41.     Erik Conley then followed Plaintiff, and asked "what did you just say?" Erik Conley then followed Plaintiff and escalated by shouting,

8

"What the f--- did you just say?"

42.    Shortly thereafter, without provocation from Plaintiff, Erik Conley
       terminated Plaintiff by yelling, "F--- you, Ike, and get the f--- out of
       my lot."

*Unemployment Hearing*

43.    Following Plaintiff's termination, Plaintiff sought unemployment
       benefits. Defendant contested those benefits, and at the hearing,
       argued it had a legitimate reason for Plaintiff's termination and that
       Plaintiff was terminated for violating a workplace rule. The
       Department of Labor found that Plaintiff was not at fault for his
       termination and granted him unemployment benefits.

*Timely Filing of Plaintiff's EEOC Claims*

44.    Plaintiff filed a charge of discrimination and hostile work environment
       with the EEOC on March 27, 2014.

45.    On April 24, 2015, Ms. Lucille Greene, Senior Investigator with the
       EEOC, emailed Plaintiff with an outline of information provided by
       Defendant in reference to Plaintiff's EEOC complaint. Ms. Greene

requested that Plaintiff respond via email with any additional

information to support his charge of discrimination by March 8, 2015.

46.     Plaintiff responded to Ms. Greene and supplied the information Ms.

Greene requested on or before March 8, 2015.

47.     On May 10, 2014, Plaintiff emailed Ms. Greene and requested that his

address be updated to 1333 Champion Run Drive, Dacula, Georgia,

30019.

48.     On July 7, 2015, the EEOC attempted to send Plaintiff a notice of

dismissal and right to sue letter. That letter was incorrectly addressed

to **133** Champion Run Drive, Dacula, GA 30019. Plaintiff's actual

address is **1333** Champion Run Drive, Dacula, GA 30019.

49.     Plaintiff did not receive the right to sue letter sent by the EEOC, and

did not receive any notice that the right to sue letter had been issued.

50.     On October 23, 2016, Plaintiff emailed Ms. Greene to check on the

status of his EEOC complaint.

51.     On October 24, 2016, Ms. Greene responded and stated that the case

had been closed on July 2, 2015.

52.    The first time that Plaintiff learned that his EEOC case had been closed and a right to due notice had been issued was October 24, 2016.

53.    The reason for Plaintiff's delay in checking on the status of his EEOC complaint between July 2015 and October 2016 is that Plaintiff had previously been informed that the EEOC was experiencing a large backlog of cases, and therefore he should expect long delays in the processing of his case.

54.    Plaintiff previously experienced a delay of approximately one year between the filing of his complaint in March, 2014 and receiving follow-up questions from the EEOC  in April, 2015.

55.    Due to his experience with the long delay in the EEOC proceeding with his case and his case manager's previous statement that the EEOC was suffering from a large backlog, Plaintiff believed that the delay in the EEOC's subsequent response was normal.

56.    Prior to October 24, 2016, Plaintiff had no reason to believe that the EEOC had issued a right to sue letter or the the EEOC completed its

investigation.

57.     Plaintiff has exhausted his administrative remedies.

### Count I
*Hostile Work Environment under 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981*

58.     During Plaintiff's employment, he was subject to numerous

derogatory racial and ethnic comments and slurs made by both his co-

workers and the management of Mall of Georgia Ford.

59.     Throughout the course of Plaintiff's employment, Erik Conley,

Charles Aycock, and Eric Smith mockingly made

"clicking" sounds at Plaintiff; these clicking sounds were an attempt

to imitate the sounds associated with certain languages of Africa

which use click consonants.

60.     Throughout the course of Plaintiff's employment, Erik Conley and

other management staff made to Plaintiff such as, "Why are you

[Africans] all over here? You should stay in the jungle."

61.     During Plaintiff's employment, when using the public address system

at the dealership, Erik Conley, Charles Aycock, and Eric Smith and

other employees would call out Plaintiff's name by stating "Itchy

dicky, no reach around" to humiliate Plaintiff by mocking his Nigerian name, Ikedichi Nwokoro.

62.     During sales meetings, Erik Conley repeatedly used the term "blood diamond" to describe the sales bonuses he was offering to the sales staff. Whenever he used the term, Mr. Conley would ask Plaintiff to explain the term "blood diamond." If Plaintiff attempted not to answer, Mr. Conley would often insist that Plaintiff explain that Mr. Conley was referencing the practice killing of Africans for diamonds that were then exported to the west for profit.

63.     During Plaintiff's employment, co-workers and management staff repeatedly referred to Plaintiff as the "Nigerian Nightmare" as an attempt to denigrate Plaintiff's national origin.

64.     Throughout the course of Plaintiff's employment, Erik Conley referred to Plaintiff as a "f****** African," and stated that "You Africans are not scared of death and will blow yourselves up."

65.     During Plaintiff's employment, co-workers and managers repeatedly commented, when they received spam messages in their email, that

they were receiving emails from Plaintiff's "brothers in Nigeria."

66.     Eric Smith repeatedly played pranks on employees who came from other countries, and did not play similar pranks on white and American-born employees.

67.     The management team at Mall of Georgia Ford used Plaintiff as a means to vent their disgust against blacks and  President Obama.

68.     During the 2012 election, the management staff vocally supported Mitt Romney. On the night of the election, Charles Aycock said "if Obama wins again, I will fire every black person in my department."

69.     On July 13, 2013, at approximately 11:00 pm, after the night of George Zimmerman's acquittal, Eric Smith sent Plaintiff a photo via text message of a rapper and gang member by the name of "The Game." The photo depicted an individual with tattoos and gold teeth standing in an intimidating pose. Eric Smith captioned the photo with "Trayvon Martin."

70.     In October 2012, Max Barber, Chief Operating Officer for Mall of Georgia Ford, said to Plaintiff that Mr. Barber had a property in White

14

County by the lake, and "you know what White County means – any black person coming over there would be shot."

71.    In October 2013, Plaintiff was being considered for a promotion within Mall of Georgia Ford. After Plaintiff failed to be promoted, Charles Aycock stated that he did not promote Plaintiff because Aycock could not trust Plaintiff because Aycock believed Plaintiff "came from a criminal culture." Erik Conley also used, and relied upon, the statement that Plaintiff came from "a criminal culture" when determining whether to promote Plaintiff.

72.    Plaintiff then complained to Erik Conley about the comment, and Conley did not take any action. Later, after Eric Smith learned of Plaintiff's complaint to Conley, Smith threatened Plaintiff that he could be fired for "no reason."

73.    In November, 2013, Eric Smith recorded a video of a co-worker standing behind Plaintiff, who was unaware of the co-worker's presence, and using a fake penis to simulate a sex act upon Plaintiff. Mr. Smith then sent the video to other Ford dealerships. No other

employee was subject to this kind of harassing conduct.

74.     In December 2013, Plaintiff won a sales contest at the dealership. The
        prize for the contest was a limousine ride to the Georgia Dome to
        watch a professional football game. During the ride, a radio
        commercial played a jingle from the movie The Lion King. After
        hearing the jingle, Erik Conley asked Plaintiff whether the song
        "reminded him of jungle?"

75.     After Plaintiff completed a car sale and promised the customer that
        Mall of Georgia Ford would deliver the truck to the customer's house,
        Erik Conley stated that Plaintiff would be required to pay $100 to the
        dealership's delivery drivers to complete the delivery unless Plaintiff
        sang the song "Proud to Be An American" by Lee Greenwood.

76.     In early 2014, Plaintiff was in the break room and pouring a cup of
        coffee. When Plaintiff realized the creamer for the coffee was empty,
        Eric Smith sarcastically asked why Plaintiff needed creamer, since
        where Plaintiff came from "people did not have coffee machines let
        alone creamer."

16

77.     On March 22, 2014, without any prompting from Plaintiff, Eric Smith
        called Plaintiff to Smith's car. The purpose of doing so was so that
        Smith could show Plaintiff Smith's gun. Smith stated to Plaintiff, "this
        is what Republicans carry." Given the hostile and discriminatory
        environment, Plaintiff's previous Human Resources complaint against
        Mr. Smith, Smith previous statements, including that he would "fire
        [Plaintiff] for no reason," the late-night text message about Georgia
        Zimmerman, and other matters outlined in this complaint, Plaintiff
        reasonably believed that Smith was threatening him.

78.     After the incident in which Smith showed Plaintiff the gun, Plaintiff
        was scared to work late because he did not want to be at the dealership
        alone with Smith.

79.     The management and employees of Mall of Georgia Ford engaged in
        harassing conduct directed at other minorities. Examples include, but
        are not limited, to the following:

        a.      Erik Conley repeatedly referred to another co-worker,  of
                Indian descent as a "terrorist." Tesh Kara During a meeting

17

awarding sales prizes Mr. Conley asked a white sales representative why he allowed "even this terrorist" to earn more sales than the white employee.

b.    Charles Aycock forced another Nigerian employee to read a passage from a book aloud in front of other employees to "prove that [the employee] could speak English" due to a perceived Nigerian accent.

80.    As part of the harassment faced by Plaintiff, the management staff deprived Plaintiff of access to customers and sales that they did not deny to white employees.

81.    As part of the ongoing discrimination faced by Plaintiff, the management staff disciplined Plaintiff more harshly than white co-workers. Specifically, during the course of Plaintiff's employee he was involved in a verbal altercation with a white employee. Although management verified with witnesses that the white employee was the aggressor, only Plaintiff was subject to discipline.

82.    The harassment altered the terms and conditions of Plaintiff's

employment and created a discriminative and abusive working environment.

83.     Plaintiff subjectively perceived that his working environment was hostile and abusive, and a reasonable person would have perceived Plaintiff's working environment as hostile and abusive.

84.     The comments at issue in this case were not isolated incidents, and were pervasive in the workplace.

85.     Defendant's supervisors were aware of the comments and actions at issue and condoned the comments and actions in spite of Plaintiff's repeated complaints.

## **Count II**
*Workplace Discrimination under 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981*

86.     Plaintiff was qualified for his position as a sales consultant and met all sales goals and was in compliance with workplace rules at the time of his termination.

87.     Plaintiff suffered an adverse employment action in the form of termination from employment.

88.     Plaintiff's termination was predicated upon Erik Conley wrongfully

depriving Plaintiff of a monthly bonus.

89.      Plaintiff's termination was further predicated upon Plaintiff's simple
statement that he "could not endure this type of treatment."

90.      Plaintiff was treated less favorably than similarly-situated workers
outside Plaintiff's protected class. Workers outside Plaintiff's class
have not been disciplined or terminated simply for making a passing
comment, nor have they had their bonuses wrongfully withheld or
reduced.

91.      Defendant cannot establish a legitimate non-discriminatory reason for
Plaintiff's termination.

## Count III
*Retaliation under 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981*

92.      Erik Conley learned of Plaintiff's EEOC complaint on April 2, 2014.

93.      Prior to the EEOC complaint, Plaintiff repeatedly raised the issue of
racial harassment and discrimination in the workplace.

94.      Plaintiff repeatedly complaint to Erik Conley about discriminatory
comments in the workplace.

95.      Prior to his termination, management staff stated to Plaintiff that they

believed he was attempting to "build a case" against the dealership for discrimination and might be planning to file a lawsuit.

96.     After learning of Plaintiff's EEOC complaint, Erik Conley sought to retaliate against Plaintiff for filing the complaint.

97.     Erik Conley initially reduced Plaintiff's monthly bonus as previously described in this Complaint. When Plaintiff attempted to rectify the error, Conley fired Plaintiff.

98.     Plaintiff's termination was directly and proximately caused by Conley learning of the EEOC complaint and by Plaintiff's previous internal complaints of a hostile and discriminatory working environment.

*Request for Relief*

WHEREFORE, Plaintiffs request this Court:

a.     hold a trial by jury on all issues so triable;

b.     award back pay and front pay in an amount to be proven at trial;

c.     award compensatory, special, and punitive damages against Defendant in an amount to be proven at trial;

d.     award Plaintiff's attorney's fees under 42 U.S.C. § 2000e-5 and 42

21

U.S.C. § 1988, and as authorized by law;

e.      grant such other and further relief as this Court deems just and proper.

Respectfully submitted, this 17th day of April, 2017.

s/Aubrey T. Villines, Jr.
Aubrey T. Villines, Jr.
Georgia Bar No. 727750
atvill7@msn.com

s/Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553
jeff@law.filipovits.com

2900 Chamblee-Tucker Road
Building 1
Atlanta, Georgia 30341
Phone: 770-455-1350
Fax: 770-455-1449

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

s/Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing AMENDED COMPLAINT upon all parties by electronic filing through the CM/ECF system in accordance with the United States District Court rules.

This 17th day of April, 2017.

s/Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553