IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

```
IKEDICHI NWOKORO,              )
                              )
          Plaintiff,           )
                              )
   vs.                         ) Case No.:
                              ) 1:17-cv-00225-MHC-AJB
GAWVT MOTORS, LLC, d/b/a MALL  )
OF GEORGIA FORD, et. al,        )
                              )
          Defendants.          )
_____)
```

**THE DEPOSITION OF NATHAN ANDREW LEWIS**

**(30(b)(6) - GAWVT MOTORS, LLC)**

Phoenix, Arizona
March 28, 2018
10:04 a.m.

(COPY)

**PREPARED FOR:**                    **REPORTED BY:**
                                 HERDER & ASSOCIATES, LLC
                                 HALEY DAWN WESTRA, RPR
                                 Certified Court Reporter
ATTORNEY                         AZ-CR No. 50762

1                              **I N D E X**

2       Examination By:                              Page:

3       MR. FILIPOVITS                                 5

4

5

6                            **E X H I B I T S**

7       **EXHIBIT**              **DESCRIPTION**              **MARKED**

8       No. 44      Plain text e-mail correspondence       21

9       No. 45      E-mail correspondence, dated Mar 14,   27
                    2018
10

11

12                           **E X H I B I T S**

13      **EXHIBIT**              **DESCRIPTION**             **REFERRED**

14      No. 43      Plaintiff's Sixth Notice of            8

15                  Depositions (Amended)

16

17

18

19                          *   *   *   *   *

20

21

22

23

24

25

1             THE DEPOSITION OF NATHAN ANDREW LEWIS, taken

2   at 10:04 a.m., on March 28, 2018, at the Offices of

3   Herder & Associates, 2 North Central Avenue, Suite

4   1800, Phoenix, Arizona, before HALEY DAWN WESTRA, a

5   Certified Reporter in the State of Arizona.

6

7   **COUNSEL APPEARING:**

8

    For the Plaintiffs:

9

    FILIPOVITS LAW FIRM, P.C.
10  BY:  Mr. Jeffrey R. Filipovits, Esq. (Telephonically)
    2900 Chamblee-Tucker Road, Building 1
11  Atlanta, Georgia  30341
    jrfilipovits@gmail.com, 678-237-9302

12

13

    Co-Counsel for the Plaintiffs:

14

    LAW OFFICE OF LISA C. LAMBERT
15  BY:  Ms. Lisa C. Lambert, Esq. (Telephonically)
    245 North Highland Avenue, Suite 230-139
16  Atlanta, Georgia  30307
    lisa@civil-rights.attorney, 404-556-8759

17

18

    For the Defendants:

19

    DeLONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC
20  BY:  Mr. Michael A. Caldwell, Esq. (Telephonically)
    101 Marietta Street, Suite 3100
21  Atlanta, Georgia  30303
    michaelcaldwell@dcbflegal.com, 888-680-0416

22

23

24

25

```
                                        Phoenix, Arizona
                                        March 28, 2018
                                        10:04 a.m.


                    P R O C E E D I N G S


        MR. FILIPOVITS:  Okay.  We are here for the
30(b)(6) deposition of GAWVT Motors, LLC on subjects
related to the production of certain e-mail evidence.
        Mike, are you guys going to read and sign?
        MR. CALDWELL:  Yes, we will read and sign.
        And we have to hold on one moment.  I need to
get the notice.  I don't have that in front of me.
        MR. FILIPOVITS:  Oh, Mike, I got a copy for
you.  Yeah.
        Beyond that, deposition is being taken for the
purposes of all uses authorized under the Federal Rules
of Civil Procedure.
        We will reserve objections, except to those to
the form of the question.
        Any other preliminary matters?
        MR. CALDWELL:  The responsiveness of the
answer.
        MR. FILIPOVITS:  And to the responsiveness.
        MR. CALDWELL:  And privilege.
        MR. FILIPOVITS:  And privilege, of course.
```

```
 1              With that, would you please swear in the
 2    witness, Madam Court Reporter.
 3
 4                      NATHAN ANDREW LEWIS,
 5    a witness herein, having been first duly sworn by the
 6    Certified Reporter to speak the truth and nothing but
 7    the truth, was examined and testified as follows:
 8
 9                         EXAMINATION
10    BY MR. FILIPOVITS:
11       Q.   All right.  Mr. Lewis, good morning.  My name
12    is Jeff Filippvits.  I represent the plaintiff in this
13    case, and I'm going to be asking you some questions.
14              Before we get there, I just want to make sure
15    we've got all the documents in front of us.
16              I've sent the court reporter -- or the court
17    reporter's dispatcher, some e-mails with some exhibits.
18              Do you have exhibits in front of you?
19       A.   I do.
20       Q.   Okay.  And I just want to make sure we have
21    all the same numbers.  I have Exhibit 4, Exhibit 31,
22    Exhibit 32, Exhibit 43, and then there are a few
23    e-mails which are not labeled.
24              Do you have all the documents I've referenced
25    so far?
```

1      A.   I do.

2      Q.   Okay.  All right.  Well, we'll get to the

3  other ones later.

4           All right.  Would you please state your full

5  name for the record.

6      A.   Nathan Andrew Lewis.

7      Q.   And how are you employed?

8      A.   I'm employed by Berkshire Hathaway Automotive

9  as the head of IT systems and development.

10     Q.   How long have you been at that job?

11     A.   Just over three years.

12     Q.   So that means you started in 2015?

13     A.   That's correct.

14     Q.   And who preceded you in that position before

15  2015?

16     A.   Unknown.

17     Q.   Unknown to you or unknown to anyone?

18     A.   Unknown to me.  My position didn't exist.

19     Q.   Okay.  Did you move into this position as a

20  new hire or were you promoted or moved laterally?

21     A.   As a new hire.

22     Q.   Who is your supervisor?

23     A.   Currently I report to the CFO.

24     Q.   And that's the CFO of Berkshire Hathaway

25  Automotive, Incorporated?

1    A.    Correct.

2    Q.    And do you have individuals who report to you?

3    A.    Yes.

4    Q.    How many?

5    A.    Three.

6    Q.    Can you tell us their names and their

7  positions?

8    A.    I have Jeffrey Grant [phonetic].  He is a

9  system administrator.  I have Sean Lines [phonetic].

10  He is a software developer.  And I have -- I'm going

11  have to spell this, Smail Mustedanagic.  It's

12  M-U-S-T-E-D-G-A-N-I-C [sic], and his first name is

13  S-M-A-I-L, and he's just kind of general desktop

14  support.

15    Q.    Okay.  Can you tell us, just give us an

16  overview of your day-to-day responsibilities in your

17  current position?

18    A.    I'm responsible for the -- all of the IT

19  infrastructure, data center, hardware/software,

20  servers, maintenance of antivirus, things like that,

21  along with ongoing software development.

22    Q.    And who do you provide those services -- those

23  IT services to?  I mean, I know Berkshire Hathaway

24  Automotive, but I assume you provide these services to

25  dealerships?

1      A.    In some regard.  I work for the corporate

2  office, and the vast majority of what I have is under

3  corporate; but by extension, the dealerships.

4      Q.    Okay.  So are the e-mail servers used by the

5  dealerships maintained by you or members of your team?

6      A.    Yes.

7      Q.    And was that the case since you have been

8  employed at Berkshire Hathaway?

9      A.    Yes.

10      Q.    All right.  Did you receive -- would you turn

11  to Exhibit 43, which is a copy of a notice of

12  deposition.

13          Did you review that document before coming in

14  to testify today?

15      A.    Yes.

16      Q.    And if you turn to the second page of that, it

17  starts at the top that has been designated for your

18  testimony.

19          Did you review each of those designations?

20      A.    Yes.

21      Q.    And are there any designations there that you

22  do not believe that you are the proper representative

23  to testify about?

24      A.    No.

25      Q.    Okay.  Did you bring any documents with you to

1    this deposition?

2        A.    No.

3        Q.    Did you review any documents in preparation

4    for this deposition?

5        A.    Beyond this notice, no.

6        Q.    All right.  So let's turn to the first

7    designation that's on page 2, which states that

8    we're -- we'd like to talk about the type of mail

9    server used by Mall of Georgia Ford, in particular for

10   e-mail addresses associated with the vtaig.com domain,

11   which I believe is informally called VTAIG.

12             Are you familiar with that mail server?

13       A.    Yes.

14       Q.    Can you tell us what software is used to run

15   that serve?

16       A.    Currently, it's Microsoft Exchange 2013.

17       Q.    Do you know when that was implemented first?

18       A.    April/May of 2015.

19       Q.    Do you know what software was used prior to

20   that April or May in 2015?

21       A.    Microsoft Exchange 2007.

22       Q.    Were you responsible for the upgrade from 2007

23   to 2013?

24       A.    In part.

25       Q.    As part of that upgrade, did you migrate all

1  of the e-mail data from the previous server to the new

2  server?

3      A.   We migrated all the e-mail boxes.

4      Q.   Okay.  So what about the individual e-mail --

5  and forgive me if my terminology isn't precise, and

6  please feel free to correct it as necessary.

7           When you say you migrated all the e-mail

8  boxes, does that mean that all the e-mails that were

9  stored on the server were transferred to the new

10  server?

11      A.   That's correct.

12      Q.   That's correct, you said?

13      A.   Yes.

14      Q.   Sorry, you broke up for a second.

15      A.   Yes, that's correct.

16      Q.   I wanted to verify your answer.

17      A.   Yes, that's correct.

18      Q.   Okay.  Thank you.

19           And when you migrated that data, were you

20  aware of any litigation holds on any of the e-mail

21  accounts --

22      A.   No.

23      Q.   -- that were associated with -- you were not

24  aware of any litigation holds whatsoever?

25      A.   No.

1    Q.   Okay.  Asking specifically about how the

2    e-mail server for VTAIG used by the Mall of Georgia for

3    employees; do you know if that is a POP3 or IMAP

4    protocol?

5    A.   It's capable of both.  That's determined by

6    the client.  We serve both.

7    Q.   Do you know whether Mall of Georgia Ford uses

8    POP3 or IMAP?

9    A.   Mall of Georgia Ford in what capacity, on the

10   VTAIG domain?

11   Q.   Yeah, all my questions, unless I state

12   otherwise, are going to be directed to the VTAIG

13   domain.

14   A.   Yes, they're the same as everybody else.

15   Q.   So is that POP3 or IMAP?

16   A.   It's both.  We serve both protocols out of the

17   same server.

18   Q.   Okay.  So maybe help me understand this.

19        My understanding is if you use POP3, that

20   means that a copy of the e-mail is not left on the

21   server after it's retrieved by the client; is that

22   correct?

23   A.   It's an exchange server, so it can be accessed

24   through POP or IMAP, but exchange servers retain all

25   e-mails on the server.

1      Q.    Okay.  So a person using, say, Outlook as a

2   client to retrieve their e-mails from the server cannot

3   control whether e-mails on the server are actually

4   deleted; is that correct?

5      A.    No, that's not correct.

6      Q.    Okay.  Tell me why.

7      A.    They're open to delete e-mails.  And when

8   they're deleted from their client, it's going to delete

9   it from the server as well.  That's just inherent to

10   the way that Microsoft Exchange works.

11      Q.    So in other words, a person -- to delete

12   e-mails from the server, a person does not need

13   authority or permission, you know, in the form of

14   authority to access the server to delete the e-mails;

15   they can just delete it straight from their client?

16      A.    Correct.

17      Q.    Okay.  What are your -- I'm going to skip

18   ahead to number 3 on our designations there, "Policies

19   and practices concerning backing up data from the

20   server."

21          How regularly are backups of the VTAIG mail

22   server made?

23      A.    Daily.

24      Q.    And how are those backups made?

25      A.    We use a backup software called Veeam

1    V-E-E-A-M.

2        Q.   Okay.  Where is that data stored when it's

3    backed up?

4        A.   We rent space in a data center colo in

5    Richardson, Texas.

6        Q.   Do you know what the backup schedule was going

7    back to 2014?

8        A.   I do not.

9        Q.   Who would know that -- the answer to that

10   question?

11       A.   I'm not sure.  The Van Tuyl Group, before the

12   changeover, contracted with an outside third party; but

13   that was before my time, so I don't know much about

14   that.

15       Q.   Do you know who the third party was?

16       A.   I believe the name was Billy Dunn & Associates

17   [phonetic].

18       Q.   Did you ever have any interaction with them at

19   all?

20       A.   Minimal, just during the handoff between VTAIG

21   and Berkshire Hathaway Automotive, mainly just

22   information gathering, but very very briefly; two

23   months maybe.

24       Q.   And let me just clarify when exactly that

25   handoff occurred.

1    A.   The company was -- officially changed hands in

2  January of 2015, so immediately following that.

3    Q.   And were you there in January 2015?  I don't

4  think we nailed down exactly when it started.

5    A.   I was not.  I started in February.

6    Q.   Were you responsible -- well, let me back up.

7       Are you aware that in this case we requested

8  that certain keyword searches be performed on certain

9  e-mail accounts for a specific time period?  Are you

10 aware of that request?

11   A.   Yes, I was aware of that.

12   Q.   Okay.  And what role did you play in gathering

13 the data to -- well, let me back up.  I apologize.

14      You gathered the e-mail data that we requested

15 and then supplied it to the attorneys representing

16 GAWVT; is that correct?

17   A.   That's correct.

18   Q.   Okay.  Did you have any direct interaction

19 with the ESI consultant that was retained by GAWVT

20 Motors?

21   A.   Is that Jeffrey Sayer?

22   Q.   It is, correct.

23   A.   I sent the e-mail files to him.  Beyond that,

24 it was just, you know, filling his requests.

25   Q.   And how did you send those files?

1    A.    As a PST, encapsulated this in the entire

2    e-mail box.  I saved it off the Exchange server, and

3    transferred them electronically to him.

4    Q.    Okay.  So you were responsible for saving all

5    of the data from specific accounts and when you did --

6    that's correct, right?

7    A.    Correct.

8    Q.    And when you did that, you did not

9    discriminate in what e-mails you saved or what data you

10   saved, you simply exported everything from each e-mail

11   account into -- was it a single file?

12   A.    It was individual files per e-mail address;

13   but yes, that's correct.

14   Q.    Okay.  And then forgive me if, you know, I'm

15   not asking this as efficiently as possible.

16       But did each individual e-mail -- was it each

17   individual e-mail contained in separate files?

18   A.    No, all the e-mails in a user's e-mail box

19   were contained in one file.

20   Q.    Okay.  And you said the format of that file

21   was .PST?

22   A.    That's correct.

23   Q.    And after you sent those e-mails to Jeff

24   Sayer, was that the end of your interaction with him?

25   A.    Yes.

1    Q.    Did you review any of the results of the

2    search performed by Jeff Sayer?

3    A.    I did not.

4    Q.    Did anyone else at Berkshire Hathaway, to your

5    knowledge, review the results of that search?

6    A.    I don't know.

7    Q.    What would be the process necessary for you to

8    go to the backups that have been created since

9    January 2015?

10          Can you -- you can access those.  You said you

11    rent server space, right, so you can just pull those up

12    online, right?

13    A.    No, that's not correct.

14          We keep a rolling 30-day backup.

15    Q.    Okay.

16    A.    So anything prior to 30 days, we can't

17    restore.

18    Q.    Got it.

19          Do you have any policies concerning retaining

20    e-mails if a litigation hold is placed on an e-mail

21    account?

22    A.    If a litigation hold is placed, yes.

23    Q.    Okay.  Who would be -- take me through the

24    process of placing a litigation hold on an account.

25    A.    We would get a request from our legal

1  department informing us that we need to place a

2  litigation hold on a specific e-mail address.

3          There is functionality within the Exchange

4  server to basically just check a box and flag the

5  account for litigation hold.

6     Q.   And I'm not much of a Microsoft person, so

7  forgive me.

8          But if a litigation hold is placed on the

9  account, does that mean that the user can no longer

10  delete e-mails?

11     A.   I'm not familiar with the exact functionality.

12  I believe they still have the ability to delete

13  e-mails.  But when a litigation hold is present, it

14  retains the data for longer than it normally would with

15  a normal box, a non-litigation hold.

16     Q.   Okay.  When you say that you guys do rolling

17  30-day backups, is there -- well, no forget that

18  question.

19          Does Microsoft Exchange create any logs that

20  would show when e-mails were deleted either from a

21  client or from an administrator on a server?

22     A.   I believe it has that capability.  We do not

23  have that implemented.

24     Q.   When you sent the e-mail data from export from

25  the Gmail account to Jeff Sayer, I think I asked you

1    this, but you did not review the content of any of the

2    e-mails, correct?

3        A.   I did not.

4        Q.   And you have no idea whether the e-mails that

5    you provided spanned the entire date range or only a

6    portion of a date range, correct?

7        A.   That's correct.

8        Q.   Well, let me clarify that.

9             Now, you would have -- you're familiar that we

10   requested e-mails for a certain date range, correct?

11       A.   Correct.  We did not discriminate date range

12   on what we provided.  We sent the entire e-mail box

13   irrespective of date range.

14       Q.   Understood.

15            And so if Jeff Sayer says that he doesn't have

16   an e-mail, you sent everything you had to Jeff Sayer,

17   right?

18       A.   That's correct.

19       Q.   Okay.  Give me a moment to jump around -- to

20   gather my thoughts.  You know, some of your answers

21   have cut off some questions I had.  So I got to just

22   get myself organized for a moment.  Just bear with me.

23       A.   Okay.

24       Q.   We're actually going to step out for a second

25   so that I can speak with my co-counsel, so let's just

1    go off the record for a moment.

2              (Recess was taken from 10:24 a.m. to 10:30 a.m.)

3    BY MR. FILIPOVITS:

4        Q.    Sorry about that.  Just a few more questions

5    for you, Mr. Lewis.

6              I think the answer to this one is obvious, but

7    I'm going to ask it anyway.

8              There's no -- you made no effort to go to the

9    individual -- the individuals who hold the e-mail

10   accounts; i.e., the custodians of those e-mail

11   addresses, to attempt to access their e-mails from the

12   client side, correct, when you provided this ESI

13   information to Jeff Sayer?

14       A.    That's correct.

15       Q.    If -- if a person deletes an e-mail on their

16   client, would that -- that would necessarily -- I just

17   want to make sure I understand how this works.

18             If they delete their e-mail on their Outlook

19   client, that would necessarily also remove the e-mail

20   from the e-mail server?

21       A.    After 30 days, that's correct.  We retain

22   deleted items for 30 days.

23       Q.    Okay.  If someone using their e-mail client

24   saves an e-mail in a particular folder on Outlook,

25   would that affect how it was stored on the server?

1      A.    It would change the location; but no, not

2  really.

3      Q.    Okay.  Are you familiar with any process

4  whereby e-mail boxes that are assigned to certain

5  employees who are fired, terminated, or otherwise no

6  longer employed are deleted, or are those retained?

7      A.    They're retained for 30 days post-termination.

8  And if the employee hasn't been rehired, they're

9  just -- the system just wipes them out.

10     Q.    Does anyone at -- I'll ask you specifically

11  with Mall of Georgia Ford, if you can answer.

12          But does anyone at Mall of Georgia Ford

13  actually have administrative privileges for the

14  Exchange server --

15     A.    No.

16     Q.    -- used for the VTAIG e-mails?

17     A.    No.

18     Q.    Does anyone who has administrative privileges

19  for that server work for you?

20     A.    Yes.

21     Q.    And by "for you," I mean one of those three

22  people we talked about who report to you?

23     A.    Yes.

24     Q.    All right.  In the stack of papers you have,

25  I'm going to label this one as Exhibit 44, if the court

1  reporter might assist with that process.

2          (Deposition Exhibit No. 44 was marked for

3  identification by the reporter.)

4  BY MR. FILIPOVITS:

5      Q.    Exhibit 44 is going to be a plain text e-mail

6  that shows all the headers.  You'll know it when you

7  see it.

8      A.    Yep.

9      Q.    Okay.  So that's Exhibit 44.  Just a couple

10  questions about this.

11          Looking at this header information, is it

12  possible for you to determine whether we've recovered

13  this e-mail from the mailbox of -- well, okay.  I'm

14  sorry.  Let me back up here.

15          When we get -- when we look at e-mails that

16  were produced pursuant to our request for

17  electronically stored information, and we have an

18  e-mail like this one from Kathy Miller to James

19  Delwyn -- or Delwyn James, Mike Jordan, and Erik

20  Conley, looking at this e-mail, is it possible for you

21  to tell us whose account that was recovered from?

22      A.    It would have to be either the person --

23  either Delwyn James, Mike Jordan, or Erik Conley --

24  actually, no.  I take it back.

25          It could be -- it could be any one of the four

1    of those, the sender or any one of the recipients.

2        Q.    Okay.  And none of this header information

3    helps us sort out, you know, where this particular

4    e-mail was recovered from?

5        A.    Again, with that, that message ID, I could go

6    back to the server and look up and see which -- which

7    box it came from, I believe.

8              I -- honestly, I'm not -- I'm not sure.  I

9    don't believe I can tell you definitively just from

10   what I have on this piece of paper.

11       Q.    Okay.  But it may be possible, but you're not

12   sure that we can determine whether this was recovered

13   from the mailbox of the sender or any of the

14   recipients, right?

15       A.    Correct.

16       Q.    Okay.  Were you the only person at Berkshire

17   Hathaway Automotive in the IT department who

18   communicated with Jeff Sayer?

19       A.    Yes, as far as I know.

20       Q.    Right.

21             Are you familiar with the -- the names of the

22   employees whose e-mail boxes we requested and whether

23   you can state definitively that you provided the

24   information for specific named employees?  Like if

25   I asked you if you provided Charles Aycock's e-mails to

1    Jeff Sayer, can you answer that?

2         A.   I don't have the documentation on hand.

3              I know his -- for certain I didn't send to

4    Jeff Sayer.  We did have a couple of e-mail boxes in

5    the request that did not exist anymore.

6         Q.   Do you know which e-mail boxes those were?

7         A.   I do not.

8         Q.   Do you remember whether it was the majority of

9    them?  You know, was it like we're missing half of

10   these e-mail boxes, or were there just a couple?

11        A.   There were one or two or maybe three that we

12   didn't have that were requested, but we had the vast

13   majority and provided them.

14        Q.   Okay.  If I read to you any of the names would

15   you remember if they were the ones that were not

16   present?

17        A.   Possibly.

18        Q.   All right.  Let me just go down the list, tell

19   us if you remember whether these e-mails were not

20   present in what you provided to Jeff Sayer.

21             Charles Aycock?

22        A.   I believe those were present.

23        Q.   Erik Conley?

24        A.   I believe those were present.

25        Q.   Eric Smith?

```
 1       A.   Don't know.

 2       Q.   John Hannon?

 3       A.   I do not believe so.

 4       Q.   You do not believe that they were present --

 5       A.   Correct.

 6       Q.   -- in other words?

 7            John Hunsinger?

 8       A.   Do not remember.

 9       Q.   Oh, you said "do not remember"?

10       A.   Correct.

11       Q.   Okay.  James King?

12       A.   I believe those were sent.

13       Q.   Kevin McBride?

14       A.   I believe so.

15       Q.   How about Max Barber?

16       A.   I believe so.

17       Q.   What about Mike Jordan?

18       A.   I don't believe so.

19       Q.   You don't believe that those were available?

20       A.   I don't believe so.

21       Q.   Okay.  And Kathy Miller?

22       A.   Yes, I believe so.

23       Q.   Okay.  But again, you don't know whether --

24   you know that there was some data in those e-mail

25   boxes, but you didn't look to see whether they were
```

1    within the date range that we requested, right?

2        A.   Correct, because we provided everything, so

3    there was limitation based on date range.  We sent

4    everything we had.

5        Q.   Right.  And then you just relied on Jeff Sayer

6    to narrow it from there?

7        A.   Correct.

8        Q.   Okay.  Now, let's back up and away from the

9    VTAIG domain address.

10           Now, Mall of Georgia Ford also uses mofg.com

11    as a domain name for their e-mail; is that correct?

12           MR. CALDWELL:  Not MOFG.

13           MS. LAMBERT:  MOGF.

14           MR. FILIPOVITS:  Oh, I'm sorry, I said that

15    wrong.  Hold on.  Everyone's correcting me.

16           MS. LAMBERT:  MOGF.

17    BY MR. FILIPOVITS:

18        Q.   Mogf.com, do you guys have anything to do with

19    the administration of that e-mail server?

20        A.   Currently, we do.  At the time, we did not.

21        Q.   When did you start administering that server?

22        A.   Summer of 2015, I believe.

23        Q.   Do you know who was in charge of that server

24    prior to that time?

25        A.   I do.  It was dealer.com.  They provided the

1    e-mail service that we used, and then they decided to

2    shut it down, so we took it over internally in the

3    summer of 2015.

4        Q.   When you say "they decided to shut it down,"

5    are you referring to Mall of Georgia Ford or

6    dealer.com?

7        A.   Dealer.com.

8        Q.   So is dealer.com not providing that service

9    anymore?

10       A.   That's correct.

11       Q.   And when you took it over, did you guys get

12   any of the e-mails that were stored on the dealer.com

13   server?

14       A.   We did not.

15       Q.   Okay.  So anything -- anything that was sent

16   to the mogf.com domain prior to when you took it over

17   in the summer of 2015 is lost in the abyss --

18       A.   Correct.

19       Q.   -- so to speak?

20       A.   Yep, correct.

21       Q.   All right.  Give me one more second, and I

22   might have one or two more.

23            Okay.  If you look through the documents you

24   have there, it's not marked as an exhibit yet, but

25   there's an e-mail, the subject is -- it's a Gmail

1    print -- it's Mall of Georgia Ford, and it's from Jeff

2    Sayer to Lisa Lambert and a few ccs.  Let me know if

3    you find that one.  It was sent March 14th.

4         A.   Yes, I have it.

5              (Deposition Exhibit No. 45 was marked for

6    identification by the reporter.)

7    BY MR. FILIPOVITS:

8         Q.   In that e-mail, he says, "Lisa and Jeff,

9    I have done a re-indexed and researched the inboxes of

10   that of Erik Conley and Charles Aycock and I only have

11   emails from 2017 forward."

12             Do you have any reason to dispute that is

13   true?

14        A.   No.

15        Q.   Okay.  Are you familiar with the process that

16   Jeff Sayer used to index and search these e-mails?

17        A.   I am not.

18        Q.   Are you familiar generally with any process of

19   indexing and searching e-mails in this context?

20        A.   Yes.

21        Q.   Can you explain to me when he says

22   "re-indexed," does that simply mean loading the data

23   into a format that would be easier for a program to

24   search, rather than each time you run a keyword search,

25   having to go through each individual unit -- each

1   e-mail individually?

2         MR. CALDWELL:  Object to the form of the

3   question.

4         MR. FILIPOVITS:  That's fine.  I understand.

5         MR. CALDWELL:  I didn't understand the

6   question either.

7         MR. FILIPOVITS:  All right.  Well, let me

8   re-ask it.

9   BY MR. FILIPOVITS:

10      Q.   Can you just explain to what it means -- why

11  indexing is necessary prior to performing search on

12  these e-mails?

13      A.   I honestly don't know.  And I don't know

14  exactly what he's referring to by re-indexing.

15      Q.   Okay.  One or two more, just bear with us.

16      A.   Okay.

17      Q.   When you -- are you able to easily call up

18  the -- actually, you know what, hold that question.

19        MR. FILIPOVITS:  Mike, questions?  No.

20        All right.  That's all the questions I have

21  for you.  Appreciate your time and...

22        MR. CALDWELL:  We're going to -- we've asked

23  them to allow you to read and sign, so we will be

24  sending you a copy of the transcript for you to read,

25  okay.  So we'll give you a chance to review it before

```
1   it becomes finalized so you can make any corrections
2   that you think needs to be made, okay.
3           That's it.  We've ordered a copy of the
4   transcript.
5           MS. LAMBERT:  Haley?
6           THE REPORTER:  Yes.
7           MR. CALDWELL:  Haley?
8           MS. LAMBERT:  What is the normal turnaround
9   time?
10          THE REPORTER:  10 business days.
11          MS. LAMBERT:  Okay.
12          THE REPORTER:  So regular turnaround for Jeff
13  and Lisa, and also for Michael; is that correct?
14          MR. CALDWELL:  Right.
15          MS. LAMBERT:  What kind of charges do we face
16  for expedited?
17          THE REPORTER:  It depends on what day you want
18  it.  Let me know what day you want it, and I'll shoot
19  you an e-mail with an estimate.
20          MR. CALDWELL:  Would you shoot me a copy of
21  that too?
22          THE REPORTER:  Sure.
23          (Discussion off the record.)
24          (10:47 a.m.)
25
```

1

2

3

4

5

6  ================================
   NATHAN ANDREW LEWIS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF ARIZONA          )
                               ) ss.
2    COUNTY OF MARICOPA        )

3         BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
4    duly sworn by me to testify to the whole truth; that
     the foregoing pages are a full, true and accurate
5    record of the proceedings, all done to the best of my
     skill and ability; that the proceedings were taken down
6    by me in shorthand and thereafter reduced to print
     under my direction.

7
          I CERTIFY that I am in no way related to any of
8    the parties hereto nor am I in any way interested in
     the outcome hereof.

9
          [X]   Review and signature was requested.
10        [ ]   Review and signature was waived.
          [ ]   Review and signature not required.

11
          I CERTIFY that I have complied with the ethical
12   obligations set forth in ACJA 7-206(F)(3) and ACJA
     7-206 J(1)(g)(1) and (2).  Dated at Phoenix, Arizona,
13   this 2nd day of March, 2018.
```

_Haley Dawn Westra_ (signature)

```
     _____
17          HALEY DAWN WESTRA, RPR, CRR
         Arizona Certified Reporter No. 50762

18

19        I CERTIFY that HERDER & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206 (J)(1)(g)(1) through (6).

21

22

23

24   _____
             HERDER & ASSOCIATES, LLC
25       AZ Registered Reporting Firm No. R1145
```

## 1

**1** [1] - 3:10
**10** [1] - 29:10
**101** [1] - 3:20
**10:04** [3] - 1:15, 3:2, 4:2
**10:24** [1] - 19:2
**10:30** [1] - 19:2
**10:47** [1] - 29:24
**14** [1] - 2:9
**14th** [1] - 27:3
**1800** [1] - 3:4
**1:17-cv-00225-MHC-AJB** [1] - 1:7

## 2

**2** [2] - 3:3, 9:7
**2)** [1] - 31:12
**2007** [2] - 9:21, 9:22
**2013** [2] - 9:16, 9:23
**2014** [1] - 13:7
**2015** [10] - 6:12, 6:15, 9:18, 9:20, 14:2, 14:3, 16:9, 25:22, 26:3, 26:17
**2017** [1] - 27:11
**2018** [5] - 1:14, 2:9, 3:2, 4:1, 31:13
**21** [1] - 2:8
**230-139** [1] - 3:15
**245** [1] - 3:15
**27** [1] - 2:9
**28** [3] - 1:14, 3:2, 4:1
**2900** [1] - 3:10
**2nd** [1] - 31:13

## 3

**3** [1] - 12:18
**30** [4] - 16:16, 19:21, 19:22, 20:7
**30(b)(6** [2] - 1:13, 4:7
**30-day** [2] - 16:14, 17:17
**30303** [1] - 3:21
**30307** [1] - 3:16
**30341** [1] - 3:11
**31** [1] - 5:21
**3100** [1] - 3:20
**32** [1] - 5:22

## 4

**4** [1] - 5:21
**404-556-8759** [1] - 3:16
**43** [3] - 2:14, 5:22, 8:11
**44** [5] - 2:8, 20:25, 21:2, 21:5, 21:9
**45** [2] - 2:9, 27:5

## 5

**5** [1] - 2:3
**50762** [2] - 1:25, 31:17

## 6

**6)** [1] - 31:20
**678-237-9302** [1] - 3:11

## 7

**7-206** [2] - 31:12, 31:20
**7-206(F)(3** [1] - 31:12

## 8

**8** [1] - 2:14
**888-680-0416** [1] - 3:21

## A

**a.m** [6] - 1:15, 3:2, 4:2, 19:2, 29:24
**ability** [2] - 17:12, 31:5
**able** [1] - 28:17
**abyss** [1] - 26:17
**access** [3] - 12:14, 16:10, 19:11
**accessed** [1] - 11:23
**account** [7] - 15:11, 16:21, 16:24, 17:5, 17:9, 17:25, 21:21
**accounts** [4] - 10:21, 14:9, 15:5, 19:10
**accurate** [1] - 31:4
**ACJA** [3] - 31:12, 31:19
**address** [3] - 15:12, 17:2, 25:9
**addresses** [2] - 9:10, 19:11
**administering** [1] - 25:21
**administration** [1] - 25:19
**administrative** [2] - 20:13, 20:18
**administrator** [2] - 7:9, 17:21
**affect** [1] - 19:25
**ahead** [1] - 12:18
**al** [1] - 1:8
**allow** [1] - 28:23
**Amended** [1] - 2:15
**and..** [1] - 28:21
**Andrew** [1] - 6:6
**ANDREW** [4] - 1:12, 3:1, 5:4, 30:6

**answer** [6] - 4:22, 10:16, 13:9, 19:6, 20:11, 23:1
**answers** [1] - 18:20
**antivirus** [1] - 7:20
**anyway** [1] - 19:7
**apologize** [1] - 14:13
**APPEARING** [1] - 3:7
**appreciate** [1] - 28:21
**April** [1] - 9:20
**April/May** [1] - 9:18
**Arizona** [6] - 1:14, 3:4, 3:5, 4:1, 31:12, 31:17
**ARIZONA** [1] - 31:1
**assigned** [1] - 20:4
**assist** [1] - 21:1
**associated** [2] - 9:10, 10:23
**Associates** [2] - 3:3, 13:16
**ASSOCIATES** [3] - 1:23, 31:19, 31:24
**assume** [1] - 7:24
**ATLANTA** [1] - 1:3
**Atlanta** [3] - 3:11, 3:16, 3:21
**attempt** [1] - 19:11
**attorneys** [1] - 14:15
**authority** [2] - 12:13, 12:14
**authorized** [1] - 4:16
**Automotive** [5] - 6:8, 6:25, 7:24, 13:21, 22:17
**available** [1] - 24:19
**Avenue** [2] - 3:3, 3:15
**aware** [5] - 10:20, 10:24, 14:7, 14:10, 14:11
**Aycock** [2] - 23:21, 27:10
**Aycock's** [1] - 22:25
**AZ** [1] - 1:25
**aZ** [1] - 31:25
**AZ-CR** [1] - 1:25

## B

**backed** [1] - 13:3
**backing** [1] - 12:19
**backup** [3] - 12:25, 13:6, 16:14
**backups** [4] - 12:21, 12:24, 16:8, 17:17
**Barber** [1] - 24:15
**based** [1] - 25:3
**BE** [1] - 31:3
**bear** [2] - 18:22, 28:15
**becomes** [1] - 29:1
**BENJAMIN** [1] - 3:19

**Berkshire** [7] - 6:8, 6:24, 7:23, 8:8, 13:21, 16:4, 22:16
**best** [1] - 31:5
**between** [1] - 13:20
**beyond** [3] - 4:15, 9:5, 14:23
**Billy** [1] - 13:16
**box** [6] - 15:2, 15:18, 17:4, 17:15, 18:12, 22:7
**boxes** [8] - 10:3, 10:8, 20:4, 22:22, 23:4, 23:6, 23:10, 24:25
**BRIDGERS** [1] - 3:19
**briefly** [1] - 13:22
**bring** [1] - 8:25
**broke** [1] - 10:14
**Building** [1] - 3:10
**business** [1] - 29:10
**BY** [10] - 1:23, 3:10, 3:15, 3:20, 5:10, 19:3, 21:4, 25:17, 27:7, 28:9

## C

**CALDWELL** [11] - 3:19, 4:10, 4:21, 4:24, 25:12, 28:2, 28:5, 28:22, 29:7, 29:14, 29:20
**Caldwell** [1] - 3:20
**cannot** [1] - 12:2
**capability** [1] - 17:22
**capable** [1] - 11:5
**capacity** [1] - 11:9
**Case** [1] - 1:6
**case** [3] - 5:13, 8:7, 14:7
**ccs** [1] - 27:2
**center** [2] - 7:19, 13:4
**Central** [1] - 3:3
**certain** [6] - 4:8, 14:8, 18:10, 20:4, 23:3
**Certified** [4] - 1:24, 3:5, 5:6, 31:17
**CERTIFY** [3] - 31:7, 31:11, 31:19
**CFO** [2] - 6:23, 6:24
**Chamblee** [1] - 3:10
**Chamblee-Tucker** [1] - 3:10
**chance** [1] - 28:25
**change** [1] - 20:1
**changed** [1] - 14:1
**changeover** [1] - 13:12
**charge** [1] - 25:23
**charges** [1] - 29:15
**Charles** [3] - 22:25, 23:21, 27:10

**check** [1] - 17:4
**Civil** [1] - 4:17
**clarify** [1] - 13:24, 18:8
**client** [10] - 11:6, 11:21, 12:2, 12:8, 12:15, 17:21, 19:12, 19:16, 19:19, 19:23
**Co** [1] - 3:13
**co** [1] - 18:25
**Co-Counsel** [1] - 3:13
**co-counsel** [1] - 18:25
**colo** [1] - 13:4
**coming** [1] - 8:13
**communicated** [1] - 22:18
**company** [1] - 14:1
**complied** [2] - 31:11, 31:19
**concerning** [2] - 12:19, 16:19
**Conley** [4] - 21:20, 21:23, 23:23, 27:10
**consultant** [1] - 14:19
**contained** [2] - 15:17, 15:19
**content** [1] - 18:1
**context** [1] - 27:19
**contracted** [1] - 13:12
**control** [1] - 12:3
**copy** [6] - 4:13, 8:11, 11:20, 28:24, 29:3, 29:20
**corporate** [2] - 8:1, 8:3
**correct** [38] - 6:13, 7:1, 10:6, 10:11, 10:12, 10:15, 10:17, 11:22, 12:4, 12:5, 12:16, 14:16, 14:17, 14:22, 15:6, 15:7, 15:13, 15:22, 16:13, 18:2, 18:6, 18:7, 18:10, 18:11, 18:18, 19:12, 19:14, 19:21, 22:15, 24:5, 24:10, 25:2, 25:7, 25:11, 26:10, 26:18, 26:20, 29:13
**correcting** [1] - 25:15
**corrections** [1] - 29:1
**correspondence** [2] - 2:8, 2:9
**counsel** [1] - 18:25
**COUNSEL** [1] - 3:7
**Counsel** [1] - 3:13
**COUNTY** [1] - 31:2
**couple** [3] - 21:9, 23:4, 23:10
**course** [1] - 4:25

court [3] - 5:16, 20:25
COURT [2] - 1:1, 1:25
Court [1] - 1:24, 5:2
CR [1] - 1:25
create [1] - 17:19
created [1] - 16:8
CRR [1] - 31:17
current [1] - 7:17
custodians [1] - 19:10
cut [1] - 18:21

**D**

d/b/a [1] - 1:7
daily [1] - 12:23
data [14] - 7:19, 10:1, 10:19, 12:19, 13:2, 13:4, 14:13, 14:14, 15:5, 15:9, 17:14, 17:24, 24:24, 27:22
date [7] - 18:5, 18:6, 18:10, 18:11, 18:13, 25:1, 25:3
Dated [1] - 31:12
dated [1] - 2:9
DAWN [3] - 1:24, 3:4, 31:17
day-to-day [1] - 7:16
days [5] - 16:16, 19:21, 19:22, 20:7, 29:10
dealer.com [5] - 25:25, 26:6, 26:7, 26:8, 26:12
dealerships [3] - 7:25, 8:3, 8:5
decided [2] - 26:1, 26:4
Defendants [2] - 1:9, 3:18
definitively [2] - 22:9, 22:23
delete [8] - 12:7, 12:8, 12:11, 12:14, 12:15, 17:10, 17:12, 19:18
deleted [5] - 12:4, 12:8, 17:20, 19:22, 20:6
deletes [1] - 19:15
DeLONG [1] - 3:19
Delwyn [3] - 21:19, 21:23
department [2] - 17:1, 22:17
deposition [5] - 4:7, 4:15, 8:12, 9:1, 9:4
Deposition [2] - 21:2, 27:5
DEPOSITION [2] - 1:12, 3:1
Depositions [1] -

2:15
DESCRIPTION [2] - 2:7, 2:13
designated [1] - 8:17
designation [1] - 9:7
designations [3] - 8:19, 8:21, 12:18
desktop [1] - 7:13
determine [2] - 21:12, 22:12
determined [1] - 11:5
developer [1] - 7:10
development [2] - 6:9, 7:21
direct [1] - 14:18
directed [1] - 11:12
direction [1] - 31:6
discriminate [2] - 15:9, 18:11
Discussion [1] - 29:23
dispatcher [1] - 5:17
dispute [1] - 27:12
DISTRICT [3] - 1:1, 1:2, 1:25
DIVISION [1] - 1:3
document [1] - 8:13
documentation [1] - 23:2
documents [5] - 5:15, 5:24, 8:25, 9:3, 26:23
domain [6] - 9:10, 11:10, 11:13, 25:9, 25:11, 26:16
done [2] - 27:9, 31:5
down [5] - 14:4, 23:18, 26:2, 26:4, 31:5
duly [2] - 5:5, 31:4
Dunn [1] - 13:16
during [1] - 13:20

**E**

e-mail [51] - 2:8, 4:8, 8:4, 9:10, 10:1, 10:3, 10:4, 10:7, 10:20, 11:2, 11:20, 14:9, 14:14, 14:23, 15:2, 15:10, 15:12, 15:16, 15:17, 15:18, 16:20, 17:2, 17:24, 18:12, 18:16, 19:9, 19:10, 19:15, 19:18, 19:19, 19:20, 19:23, 19:24, 20:4, 21:5, 21:13, 21:18, 21:20, 22:4, 22:22, 23:4, 23:6, 23:10, 24:24, 25:11, 25:19, 26:1, 26:25, 27:8, 28:1, 29:19
E-mail [1] - 2:9
e-mails [28] - 5:17, 5:23, 10:8, 11:25,

12:2, 12:3, 12:7, 12:12, 12:14, 15:9, 15:18, 15:23, 16:20, 17:10, 17:13, 17:20, 18:2, 18:4, 18:10, 19:11, 20:16, 21:15, 22:25, 23:19, 26:12, 27:16, 27:19, 28:12
easier [1] - 27:23
easily [1] - 28:17
efficiently [1] - 15:15
effort [1] - 19:8
either [4] - 17:20, 21:22, 21:23, 28:6
electronically [2] - 15:3, 21:17
emails [1] - 27:11
employed [4] - 6:7, 6:8, 8:8, 20:6
employee [1] - 20:8
employees [4] - 11:3, 20:5, 22:22, 22:24
encapsulated [1] - 15:1
end [1] - 15:24
entire [3] - 15:1, 18:5, 18:12
Eric [1] - 23:25
Erik [4] - 21:19, 21:23, 23:23, 27:10
ESI [2] - 14:19, 19:12
Esq [3] - 3:10, 3:15, 3:20
estimate [1] - 29:19
et [1] - 1:8
ethical [2] - 31:11, 31:19
evidence [1] - 4:8
exact [1] - 17:11
exactly [3] - 13:24, 14:4, 28:14
EXAMINATION [1] - 5:9
Examination [1] - 2:2
examined [1] - 5:7
except [1] - 4:18
exchange [2] - 11:23, 11:24
Exchange [7] - 9:16, 9:21, 12:10, 15:2, 17:3, 17:19, 20:14
exhibit [1] - 26:24
Exhibit [10] - 5:21, 5:22, 8:11, 20:25, 21:2, 21:5, 21:9, 27:5
EXHIBIT [2] - 2:7, 2:13
exhibits [1] - 5:17, 5:18
exist [2] - 6:18, 23:5
expedited [1] - 29:16
explain [2] - 27:21,

28:10
export [1] - 17:24
exported [1] - 15:10
extension [1] - 8:3

**F**

face [1] - 29:15
familiar [7] - 9:12, 17:11, 18:9, 20:3, 22:21, 27:15, 27:18
far [2] - 5:25, 22:19
February [1] - 14:5
Federal [1] - 4:16
few [3] - 5:22, 19:4, 27:2
file [3] - 15:11, 15:19, 15:20
files [4] - 14:23, 14:25, 15:12, 15:17
Filipovits [1] - 3:10
FILIPOVITS [16] - 2:3, 3:9, 4:6, 4:13, 4:23, 4:25, 5:10, 19:3, 21:4, 25:14, 25:17, 27:7, 28:4, 28:7, 28:9, 28:19
Filippvits [1] - 5:12
filling [1] - 14:24
finalized [1] - 29:1
fine [1] - 28:4
fired [1] - 20:5
Firm [1] - 31:25
FIRM [1] - 3:9
first [4] - 5:5, 7:12, 9:6, 9:17
FITZPATRICK [1] - 3:19
flag [1] - 17:4
folder [1] - 19:24
following [1] - 14:2
follows [1] - 5:7
FOR [2] - 1:2, 1:23
Ford [8] - 9:9, 11:7, 11:9, 20:11, 20:12, 25:10, 26:5, 27:1
FORD [1] - 1:8
foregoing [2] - 31:3, 31:4
forget [1] - 17:17
forgive [3] - 10:5, 15:14, 17:7
form [3] - 4:19, 12:13, 28:2
format [2] - 15:20, 27:23
forth [2] - 31:12, 31:19
forward [1] - 27:11
four [1] - 21:25
free [1] - 10:6
front [4] - 4:12, 5:15, 5:18

full [2] - 6:4, 31:4
functionality [2] - 17:3, 17:11

**G**

gather [1] - 18:20
gathered [1] - 14:14
gathering [3] - 13:22, 14:12
GAWVT [5] - 1:7, 1:13, 4:7, 14:16, 14:19
general [1] - 7:13
generally [1] - 27:18
Georgia [12] - 3:11, 3:16, 3:21, 9:9, 11:2, 11:7, 11:9, 20:11, 20:12, 25:10, 26:5, 27:1
GEORGIA [2] - 1:2, 1:8
Gmail [2] - 17:25, 26:25
Grant [1] - 7:8
Group [1] - 13:11
guys [4] - 4:9, 17:16, 25:18, 26:11

**H**

Haley [2] - 29:5, 29:7
HALEY [3] - 1:24, 3:4, 31:17
half [1] - 23:9
hand [1] - 23:2
handoff [2] - 13:20, 13:25
hands [1] - 14:1
Hannon [1] - 24:2
hardware/software [1] - 7:19
Hathaway [7] - 6:8, 6:24, 7:23, 8:8, 13:21, 16:4, 22:17
head [1] - 6:9
header [2] - 21:11, 22:2
headers [1] - 21:6
help [1] - 11:18
helps [1] - 22:3
HERDER [3] - 1:23, 31:19, 31:24
Herder [1] - 3:3
herein [1] - 5:5
hereof [1] - 31:8
hereto [1] - 31:8
Highland [1] - 3:15
hire [2] - 6:20, 6:21
hold [12] - 4:11, 16:20, 16:22, 16:24, 17:2, 17:5, 17:8, 17:13, 17:15, 19:9, 25:15, 28:18

**holds** [2] - 10:20, 10:24
**honestly** [2] - 22:8, 28:13
**Hunsinger** [1] - 24:7

**I**

**i.e** [1] - 19:10
**ID** [1] - 22:5
**idea** [1] - 18:4
**identification** [2] - 21:3, 27:6
**IKEDICHI** [1] - 1:4
**IMAP** [4] - 11:3, 11:8, 11:15, 11:24
**immediately** [1] - 14:2
**implemented** [2] - 9:17, 17:23
**IN** [1] - 1:1
**inboxes** [1] - 27:9
**Incorporated** [1] - 6:25
**index** [1] - 27:16
**indexed** [2] - 27:9, 27:22
**indexing** [3] - 27:19, 28:11, 28:14
**individual** [6] - 10:4, 15:12, 15:16, 15:17, 19:9, 27:25
**individually** [1] - 28:1
**individuals** [2] - 7:2, 19:9
**informally** [1] - 9:11
**information** [6] - 13:22, 19:13, 21:11, 21:17, 22:2, 22:24
**informing** [1] - 17:1
**infrastructure** [1] - 7:19
**inherent** [1] - 12:9
**interaction** [3] - 13:18, 14:18, 15:24
**interested** [1] - 31:8
**internally** [1] - 26:2
**irrespective** [1] - 18:13
**IT** [5] - 6:9, 7:18, 7:23, 22:17, 31:3
**items** [1] - 19:22

**J**

**J(1)(g)(1** [1] - 31:12
**J)(1)(g)(1** [1] - 31:20
**James** [4] - 21:18, 21:19, 21:23, 24:11
**January** [3] - 14:2, 14:3, 16:9
**Jeff** [16] - 5:12, 15:23, 16:2, 17:25, 18:15,

18:16, 19:13, 22:18, 23:1, 23:4, 23:20, 25:5, 27:1, 27:8, 27:16, 29:12
**Jeffrey** [3] - 3:10, 7:8, 14:21
**job** [1] - 6:10
**John** [2] - 24:2, 24:7
**Jordan** [3] - 21:19, 21:23, 24:17
**jrfilipovits@gmail.com** [1] - 3:11
**jump** [1] - 18:19

**K**

**Kathy** [2] - 21:18, 24:21
**keep** [1] - 16:14
**Kevin** [1] - 24:13
**keyword** [2] - 14:8, 27:24
**kind** [2] - 7:13, 29:15
**King** [1] - 24:11
**knowledge** [1] - 16:5
**KNOWN** [1] - 31:3

**L**

**label** [1] - 20:25
**labeled** [1] - 5:23
**LAMBERT** [7] - 3:14, 25:13, 25:16, 29:5, 29:8, 29:11, 29:15
**Lambert** [2] - 3:15, 27:2
**laterally** [1] - 6:20
**LAW** [2] - 3:9, 3:14
**left** [1] - 11:20
**legal** [1] - 16:25
**Lewis** [3] - 5:11, 6:6, 19:5
**LEWIS** [4] - 1:12, 3:2, 5:4, 30:6
**limitation** [1] - 25:3
**Lines** [1] - 7:9
**LISA** [1] - 3:14
**Lisa** [4] - 3:15, 27:2, 27:8, 29:13
**lisa@civil** [1] - 3:16
**lisa@civil-rights.attorney** [1] - 3:16
**list** [1] - 23:18
**litigation** [10] - 10:20, 10:24, 16:20, 16:22, 16:24, 17:2, 17:5, 17:8, 17:13, 17:15
**LLC** [7] - 1:7, 1:13, 1:23, 3:19, 4:7, 31:19, 31:24
**loading** [1] - 27:22
**location** [1] - 20:1
**logs** [1] - 17:19

**look** [4] - 21:15, 22:6, 24:25, 26:23
**looking** [2] - 21:11, 21:20
**lost** [1] - 26:17

**M**

**Madam** [1] - 5:2
**mail** [55] - 2:8, 2:9, 4:8, 8:4, 9:8, 9:10, 9:12, 10:1, 10:3, 10:4, 10:7, 10:20, 11:2, 11:20, 12:21, 14:9, 14:14, 14:23, 15:2, 15:10, 15:12, 15:16, 15:17, 15:18, 16:20, 17:2, 17:24, 18:12, 18:16, 19:9, 19:10, 19:15, 19:18, 19:19, 19:20, 19:23, 19:24, 20:4, 21:5, 21:13, 21:18, 21:20, 22:20, 22:22, 23:4, 23:6, 23:10, 24:24, 25:11, 25:19, 26:1, 26:25, 27:8, 28:1, 29:19
**mailbox** [2] - 21:13, 22:13
**mails** [28] - 5:17, 5:23, 10:8, 11:25, 12:2, 12:3, 12:7, 12:12, 12:14, 15:9, 15:18, 15:23, 16:20, 17:10, 17:13, 17:20, 18:2, 18:4, 18:10, 19:11, 20:16, 21:15, 22:25, 23:19, 26:12, 27:16, 27:19, 28:12
**maintained** [1] - 8:5
**maintenance** [1] - 7:20
**majority** [3] - 8:2, 23:8, 23:13
**Mall** [9] - 9:9, 11:2, 11:7, 11:9, 20:11, 20:12, 25:10, 26:5, 27:1
**MALL** [1] - 1:7
**Mar** [1] - 2:9
**March** [5] - 1:14, 3:2, 4:1, 27:3, 31:13
**MARICOPA** [1] - 31:2
**Marietta** [1] - 3:20
**marked** [3] - 21:2, 26:24, 27:5
**MARKED** [1] - 2:7
**matters** [1] - 4:20
**Max** [1] - 24:15
**McBride** [1] - 24:13
**mean** [5] - 7:23, 10:8, 17:9, 20:21, 27:22
**means** [3] - 6:12,

11:20, 28:10
**members** [1] - 8:5
**message** [1] - 22:5
**Michael** [2] - 3:20, 29:13
**michaelcaldwell@dcbflegal.com** [1] - 3:21
**Microsoft** [5] - 9:16, 9:21, 12:10, 17:6, 17:19
**might** [2] - 21:1, 26:22
**migrate** [1] - 9:25
**migrated** [3] - 10:3, 10:7, 10:19
**Mike** [6] - 4:9, 4:13, 21:19, 21:23, 24:17, 28:19
**Miller** [2] - 21:18, 24:21
**minimal** [1] - 13:20
**missing** [1] - 23:9
**MOFG** [1] - 25:12
**mofg.com** [1] - 25:10
**MOGF** [2] - 25:13, 25:16
**mogf.com** [1] - 25:18, 26:16
**moment** [4] - 4:11, 18:19, 18:22, 19:1
**months** [1] - 13:23
**morning** [1] - 5:11
**MOTORS** [2] - 1:7, 1:13
**Motors** [2] - 4:7, 14:20
**move** [1] - 6:19
**moved** [1] - 6:20
**MR** [25] - 2:3, 4:6, 4:10, 4:13, 4:21, 4:23, 4:24, 4:25, 5:10, 19:3, 21:4, 25:12, 25:14, 25:17, 27:7, 28:2, 28:4, 28:5, 28:7, 28:9, 28:19, 28:22, 29:7, 29:14, 29:20
**MS** [6] - 25:13, 25:16, 29:5, 29:8, 29:11, 29:15
**Mustedanagic** [1] - 7:11
**MUSTEDGANIC** [1] - 7:12

**N**

**nailed** [1] - 14:4
**name** [5] - 5:11, 6:5, 7:12, 13:16, 25:11
**named** [1] - 22:24
**names** [3] - 7:6, 22:21, 23:14

**narrow** [1] - 25:6
**NATHAN** [3] - 1:12, 3:1, 5:4, 30:6
**Nathan** [1] - 6:6
**necessarily** [2] - 19:16, 19:19
**necessary** [3] - 10:6, 16:7, 28:11
**need** [4] - 4:11, 12:12, 17:1
**needs** [1] - 29:2
**new** [4] - 6:20, 6:21, 10:1, 10:9
**non** [1] - 17:15
**non-litigation** [1] - 17:15
**none** [1] - 22:2
**normal** [2] - 17:15, 29:8
**normally** [1] - 17:14
**North** [2] - 3:3, 3:15
**NORTHERN** [1] - 1:2
**nothing** [1] - 5:6
**notice** [3] - 4:12, 8:11, 9:5
**Notice** [1] - 2:14
**number** [1] - 12:18
**numbers** [1] - 5:21
**NWOKORO** [1] - 1:4

**O**

**object** [1] - 28:2
**objections** [1] - 4:18
**obligations** [2] - 31:12, 31:19
**obvious** [1] - 19:6
**occurred** [1] - 13:25
**OF** [7] - 1:2, 1:8, 1:12, 3:1, 3:14, 31:1, 31:2
**OFFICE** [1] - 3:14
**office** [1] - 8:2
**Offices** [1] - 3:3
**officially** [1] - 14:1
**one** [13] - 4:11, 15:19, 19:6, 20:21, 20:25, 21:18, 21:25, 22:1, 23:11, 26:21, 26:22, 27:3, 28:15
**ones** [2] - 6:3, 23:15
**ongoing** [1] - 7:21
**online** [1] - 16:12
**open** [1] - 12:7
**ordered** [1] - 29:3
**organized** [1] - 18:22
**ORIGINAL** [1] - 1:22
**otherwise** [2] - 11:12, 20:5
**outcome** [1] - 31:8
**Outlook** [3] - 12:1, 19:18, 19:24
**outside** [1] - 13:12

overview [1] - 7:16

**P**

P.C [1] - 3:9
page [3] - 2:2, 8:16, 9:7
pages [1] - 31:4
paper [1] - 22:10
papers [1] - 20:24
part [2] - 9:24, 9:25
particular [3] - 9:9, 19:24, 22:3
parties [1] - 31:8
party [2] - 13:12, 13:15
people [1] - 20:22
per [1] - 15:12
performed [2] - 14:8, 16:2
performing [1] - 28:11
period [1] - 14:9
permission [1] - 12:13
person [7] - 12:1, 12:11, 12:12, 17:6, 19:15, 21:22, 22:16
Phoenix [4] - 1:14, 3:4, 4:1, 31:12
phonetic] [3] - 7:8, 7:9, 13:17
piece [1] - 22:10
place [1] - 17:1
placed [3] - 16:20, 16:22, 17:8
placing [1] - 16:24
Plain [1] - 2:8
plain [1] - 21:5
Plaintiff [1] - 1:5
plaintiff [1] - 5:12
Plaintiff's [1] - 2:14
Plaintifs [2] - 3:8, 3:13
play [1] - 14:12
policies [1] - 16:19
Policies [1] - 12:18
POP [1] - 11:24
POP3 [4] - 11:3, 11:8, 11:15, 11:19
portion [1] - 18:6
position [4] - 6:14, 6:18, 6:19, 7:17
positions [1] - 7:7
possible [4] - 15:15, 21:12, 21:20, 22:11
possibly [1] - 23:17
post [1] - 20:7
post-termination [1] - 20:7
practices [1] - 12:19
preceded [1] - 6:14

precise [1] - 10:5
preliminary [1] - 4:20
preparation [1] - 9:3
PREPARED [1] - 1:23
present [6] - 17:13, 23:16, 23:20, 23:22, 23:24, 24:4
previous [1] - 10:1
print [2] - 27:1, 31:6
privilege [2] - 4:24, 4:25
privileges [2] - 20:13, 20:18
Procedure [1] - 4:17
proceedings [3] - 31:3, 31:5, 31:5
process [6] - 16:7, 16:24, 20:3, 21:1, 27:15, 27:18
produced [1] - 21:16
production [1] - 4:8
program [1] - 27:23
promoted [1] - 6:20
proper [1] - 8:22
protocol [1] - 11:4
protocols [1] - 11:16
provide [2] - 7:22, 7:24
provided [9] - 18:5, 18:12, 19:12, 22:23, 22:25, 23:13, 23:20, 25:2, 25:25
providing [1] - 26:8
PST [2] - 15:1, 15:21
pull [1] - 16:11
purposes [1] - 4:16
pursuant [1] - 21:16

**Q**

questions [5] - 5:13, 11:11, 18:21, 19:4, 21:10, 28:19, 28:20

**R**

R1145 [1] - 31:25
range [5] - 18:5, 18:6, 18:10, 18:11, 18:13, 25:1, 25:3
rather [1] - 27:24
re [4] - 27:9, 27:22, 28:8, 28:14
re-ask [1] - 28:8
re-indexed [2] - 27:9, 27:22
re-indexing [1] - 28:14
read [5] - 4:9, 4:10, 23:14, 28:23, 28:24
really [1] - 20:2
reason [1] - 27:12
receive [1] - 8:10

Recess [1] - 19:2
recipients [2] - 22:1, 22:14
record [4] - 6:5, 19:1, 29:23, 31:5
recovered [4] - 21:12, 21:21, 22:4, 22:12
reduced [1] - 31:6
referenced [1] - 5:24
REFERRED [1] - 2:13
referring [2] - 26:5, 28:14
regard [1] - 8:1
Registered [1] - 31:25
regular [1] - 29:12
regularly [1] - 12:21
rehired [1] - 20:8
related [2] - 4:8, 31:7
relied [1] - 25:5
remember [5] - 23:8, 23:15, 23:19, 24:8, 24:9
remove [1] - 19:19
rent [2] - 13:4, 16:11
report [3] - 6:23, 7:2, 20:22
REPORTED [1] - 1:23
reporter [4] - 5:16, 21:1, 21:3, 27:6
Reporter [1] - 1:24, 3:5, 5:2, 5:6, 31:17
REPORTER [5] - 29:6, 29:10, 29:12, 29:17, 29:22
reporter's [1] - 5:17
Reporting [1] - 31:25
represent [1] - 5:12
representative [1] - 8:22
representing [1] - 14:15
request [4] - 14:10, 16:25, 21:16, 23:5
requested [7] - 14:7, 14:14, 18:10, 22:22, 23:12, 25:1, 31:9
requests [1] - 14:24
required [1] - 31:10
researched [1] - 27:9
reserve [1] - 4:18
responsibilities [1] - 7:16
responsible [4] - 7:18, 9:22, 14:6, 15:4
responsiveness [2] - 4:21, 4:23
restore [1] - 16:17
results [2] - 16:1, 16:5
retain [2] - 11:24, 19:21

retained [3] - 14:19, 20:6, 20:7
retaining [1] - 16:19
retains [1] - 17:14
retrieve [1] - 12:2
retrieved [1] - 11:21
Review [3] - 31:9, 31:10, 31:10
review [8] - 8:13, 8:19, 9:3, 16:1, 16:5, 18:1, 28:25
Richardson [1] - 13:5
rights.attorney [1] - 3:16
Road [1] - 3:10
role [1] - 14:12
rolling [2] - 16:14, 17:16
RPR [2] - 1:24, 31:17
Rules [1] - 4:16
run [2] - 9:14, 27:24

**S**

saved [3] - 15:2, 15:9, 15:10
saves [1] - 19:24
saving [1] - 15:4
Sayer [14] - 14:21, 15:24, 16:2, 17:25, 18:15, 18:16, 19:13, 22:18, 23:1, 23:4, 23:20, 25:5, 27:2, 27:16
schedule [1] - 13:6
Sean [1] - 7:9
search [6] - 16:2, 16:5, 27:16, 27:24, 28:11
searches [1] - 14:8
searching [1] - 27:19
second [4] - 8:16, 10:14, 18:24, 26:21
see [3] - 21:7, 22:6, 24:25
send [2] - 14:25, 23:3
sender [2] - 22:1, 22:13
sending [1] - 28:24
sent [10] - 5:16, 14:23, 15:23, 17:24, 18:12, 18:16, 24:12, 25:3, 26:15, 27:3
separate [1] - 15:17
serve [3] - 9:15, 11:6, 11:16
server [31] - 9:9, 9:12, 10:1, 10:2, 10:9, 10:10, 11:2, 11:17, 11:21, 11:23, 11:25, 12:2, 12:3, 12:9, 12:12, 12:14, 12:20, 12:22, 15:2, 16:11,

17:4, 17:21, 19:20, 19:25, 20:14, 20:19, 22:6, 25:19, 25:21, 25:23, 26:13
servers [3] - 7:20, 8:4, 11:24
service [2] - 26:1, 26:8
services [2] - 7:22, 7:23, 7:24
set [2] - 31:12, 31:19
shoot [2] - 29:18, 29:20
shorthand [1] - 31:6
show [1] - 17:20
shows [1] - 21:6
shut [2] - 26:2, 26:4
sic [1] - 7:12
side [1] - 19:12
sign [3] - 4:9, 4:10, 28:23
signature [3] - 31:9, 31:10, 31:10
simply [2] - 15:10, 27:22
single [1] - 15:11
Sixth [1] - 2:14
skill [1] - 31:5
skip [1] - 12:17
Smail [1] - 7:11
SMAIL [1] - 7:13
Smith [1] - 23:25
software [5] - 7:10, 7:21, 9:14, 9:19, 12:25
someone [1] - 19:23
sorry [4] - 10:14, 19:4, 21:14, 25:14
sort [1] - 22:3
space [2] - 13:4, 16:11
spanned [1] - 18:5
specific [4] - 14:9, 15:5, 17:2, 22:24
specifically [2] - 11:1, 20:10
spell [1] - 7:11
ss [1] - 31:1
stack [1] - 20:24
start [1] - 25:21
started [3] - 6:12, 14:4, 14:5
starts [1] - 8:17
STATE [1] - 31:1
state [3] - 6:4, 11:11, 22:23
State [1] - 3:5
states [1] - 9:7
STATES] [1] - 1:1
step [1] - 18:24
still [1] - 17:12
stored [5] - 10:9, 13:2, 19:25, 21:17,

26:12

**straight** [1] - 12:15
**Street** [1] - 3:20
**subject** [1] - 26:25
**subjects** [1] - 4:7
**Suite** [3] - 3:4, 3:15, 3:20
**summer** [3] - 25:22, 26:3, 26:17
**supervisor** [1] - 6:22
**supplied** [1] - 14:15
**support** [1] - 7:14
**swear** [1] - 5:1
**sworn** [2] - 5:5, 31:4
**system** [2] - 7:9, 20:9
**systems** [1] - 6:9

## T

**team** [1] - 8:5
**TELEPHONIC** [2] - 1:12, 3:1
**terminated** [1] - 20:5
**termination** [1] - 20:7
**terminology** [1] - 10:5
**testified** [1] - 5:7
**testify** [3] - 8:14, 8:23, 31:4
**testifying** [1] - 31:3
**testimony** [1] - 8:18
**Texas** [1] - 13:5
**text** [2] - 2:8, 21:5
**THE** [9] - 1:1, 1:2, 1:12, 3:1, 29:6, 29:10, 29:12, 29:17, 29:22
**thereafter** [1] - 31:6
**third** [2] - 13:12, 13:15
**thoughts** [1] - 18:20
**three** [4] - 6:11, 7:5, 20:21, 23:11
**today** [1] - 8:14
**took** [3] - 26:2, 26:11, 26:16
**top** [1] - 8:17
**transcript** [2] - 28:24, 29:4
**transferred** [2] - 10:9, 15:3
**true** [2] - 27:13, 31:4
**truth** [3] - 5:6, 5:7, 31:4
**Tucker** [1] - 3:10
**turn** [3] - 8:10, 8:16, 9:6
**turnaround** [2] - 29:8, 29:12
**Tuyl** [1] - 13:11
**two** [4] - 13:22, 23:11, 26:22, 28:15
**type** [1] - 9:8

## U

**U.S** [1] - 1:25
**under** [3] - 4:16, 8:2, 31:6
**understood** [1] - 18:14
**unit** [1] - 27:25
**UNITED** [1] - 1:1
**unknown** [4] - 6:16, 6:17, 6:18
**unless** [1] - 11:11
**up** [10] - 10:14, 12:19, 13:3, 14:6, 14:13, 16:11, 21:14, 22:6, 25:8, 28:17
**upgrade** [2] - 9:22, 9:25
**user** [1] - 17:9
**user's** [1] - 15:18
**uses** [3] - 4:16, 11:7, 25:10

## V

**V-E-E-A-M** [1] - 13:1
**Van** [1] - 13:11
**vast** [2] - 8:2, 23:12
**Veeam** [1] - 12:25
**verify** [1] - 10:16
**vs** [1] - 1:6
**VTAIG** [8] - 9:11, 11:2, 11:10, 11:12, 12:21, 13:20, 20:16, 25:9
**vtaig.com** [1] - 9:10

## W

**waived** [1] - 31:10
**WESTRA** [3] - 1:24, 3:4, 31:17
**whatsoever** [1] - 10:24
**whereby** [1] - 20:4
**whole** [1] - 31:4
**wipes** [1] - 20:9
**witness** [3] - 5:2, 5:5, 31:3
**words** [2] - 12:11, 24:6
**works** [2] - 12:10, 19:17

## Y

**years** [1] - 6:11