IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IKEDICHI NWOKORO,              :
                              :
          Plaintiff,          :
                              :
v.                            :        CIVIL ACTION FILE NO.
                              :        1:17-CV-0225-MHC-AJB
GAWVT MOTORS, LLC, d/b/a      :
MALL OF GEORGIA FORD;         :
BERKSHIRE HATHAWAY            :
AUTOMOTIVE, INC, d/b/a/       :
MALL OF GEORGIA FORD;         :
VAN TUYL GROUP, LLC, d/b/a    :
MALL OF GEORGIA FORD,         :
                              :
          Defendants.         :

## O R D E R

Currently before the Court is Plaintiff's motion for spoliation sanctions against Defendant GAWVT Motors, LLC ("GAWVT" or "Defendant"). [Doc. 75]. For the reasons below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    *Background*

### A.    **Procedural Background**

Plaintiff initiated this case on January 19, 2017. [Doc. 1]. Prior to filing suit, on March 27, 2014, Plaintiff filed a charge of discrimination and hostile work environment with the Equal Employment Opportunity Commission ("EEOC"). [Doc. 1 at ¶ 17].

AO 72A
(Rev.8/8
2)

On April 16, 2014, Defendant received a letter from Plaintiff's attorney, dated April 10, 2014, informing it of the charge and asking it to preserve "any and all evidence, including videos, photos, personnel files, emails, correspondence, and documentation pertaining to Mr. Nwokoro or to this matter." [Doc. 79 at 2-3].

On April 24, 2015, Ms. Lucille Greene, Senior Investigator with the EEOC, emailed Plaintiff, enclosing an outline of information provided by Defendant in reference to Plaintiff's EEOC complaint, and requested that Plaintiff respond by email by March 8, 2015 with any additional information to support his charge. [Doc. 1 at ¶ 18]. On May 10, 2015, Plaintiff emailed Ms. Greene and requested that his address be updated to 1333 Champion Run Drive, Dacula, Georgia 30019. [*Id.* at ¶ 20].

On July 7, 2015, the EEOC mailed Plaintiff a notice of dismissal and right to sue addressed to "133 Champion Run Drive, Dacula, GA 30019." [*Id.* at ¶ 21]. Plaintiff did not receive the right to sue letter sent by the EEOC, and did not receive any notice that the right to sue letter had been issued. [*Id.* at ¶ 22]. On October 23, 2016, Plaintiff emailed Ms. Greene to check on the status of his EEOC complaint and, on October 24, 2016, Ms. Greene responded that the case was closed on July 2, 2015. [*Id.* at ¶¶ 23-24]. Plaintiff claims that he delayed checking on the status of his EEOC complaint because he was previously informed that the EEOC was experiencing a large backlog of cases,

2

and should expect long delays in the processing of his case, previously experienced a delay of approximately one year between the filing of his complaint in March 2014 and receiving follow-up questions from the EEOC in April 2015, and believed that the delay was normal.  [*Id.* at ¶¶ 26-28].

Plaintiff's initial judicial complaint asserted federal-question jurisdiction under 42 U.S.C. § 2000e.   [*Id.* at ¶ 13].   Plaintiff alleged hostile work environment, discrimination under 42 U.S.C. § 2000e-2, and retaliation under 42 U.S.C. § 2000e-3 by GAWVT—a Delaware company, registered to do business in Georgia, who registered the trade name "Mall of Georgia Ford"—, Van Tuyl Group, LLC[1] ("Van Tuyl")—a Delaware company that owned Mall of Georgia Ford until March 2015—, and Berkshire Hathaway Automotive, Inc.[2] ("Berkshire")—a Delaware company, registered to do business in Georgia that acquired Van Tuyl in March 2015. [*Id.* at ¶¶ 3-4, 6, 8, 10, 12].  Defendants answered on March 28, 2017.  [Docs. 6-8].

On April 17, 2017, Plaintiff amended his complaint, keeping the substance of his claims the same while also alleging that Defendants violated 42 U.S.C. § 1981. [Doc. 11].   The parties filed their Joint Preliminary Report and Discovery Plan on

---

[1]        Van Tuyl contends that it is improperly joined.  [Doc. 12 at 9].

[2]        Berkshire contends that it is improperly joined.  [Doc. 12 at 9].

3

April 26, 2017 and stated that they did not anticipate needing additional time for discovery, but that they expected discovery as to "the email server used for Mall of Georgia [Ford] employees, as well as any other communication system used by employees" for "the entire duration of Plaintiff's employment and preliminarily, be limited to communications of Charles Aycock, Erik Conley, Eric Smith, and any other supervisory employee" using both keyword and Boolean searches. [Doc. 12 at 13-14].

Plaintiff filed the pending motion on April 20, 2018. [Doc. 75]. Defendant responded on May 4, 2018, [Doc. 79], and Plaintiff replied on May 18, 2018, [Doc. 83]. The issues being fully briefed, the matter is now ripe for adjudication.

## B.    Factual Background

Viewing the allegations in the amended complaint as true, the facts for purposes of the pending motion are as follows. Plaintiff is an African American male citizen of Nigerian descent who began work as a sales consultant at the Mall of Georgia Ford in September 2009, reporting directly to Eric Smith ("Smith") and Charles Aycock ("Aycock"), with ultimate personnel decisions made by Erik Conley ("Conley"). [Doc. 11 at ¶¶ 17-21]. Plaintiff alleged that he "was one of the highest performing sales consultants within Mall of Georgia Ford," and that Aycock often requested "that

4

Plaintiff assist other sales people who were having trouble closing sales, and the managers . . . often asked Plaintiff to train new employees." [*Id.* at ¶¶ 22-23].

Each month, Mall of Georgia Ford sales consultants received a bonus based on their sales and email capture rate (i.e. the number of in-person customers whose email address the employee obtained), and the customer service interview, or CSI, score (a rating given by customers who review their experience). [*Id.* at ¶¶ 26-27].  Managers automatically were forwarded all CSI scores on their email accounts (at VTAIG.com). [Doc. 75 at 8 (citing [Doc. 69 at 11:25-13:10])].  In order to qualify for a bonus, a salesperson's "composite score" needed to be above the "group" score for the month. [*Id.* (citing [Doc. 68 at 62:4-63:2])].  In March 2014, the group score was 92.4.  [*Id.* (citing [Doc. 75-8])[3]].  Plaintiff, as well as Martin Williams and James Robertson, had March 2014 scores below that level but only Plaintiff's bonus was reduced.  [*Id.* (citing [Doc. 75-3][4])].  Defendant's policy, if an employee believed a bonus was improperly

---

[3]     A copy of a spreadsheet time-stamped "8/17/2017 13:28" lists composite scores for all used car salespersons.  It also lists the number of surveys taken and the average scores of all of them.  However, it does not list the raw data or the CSI scores in the form in which they were sent to whoever compiled the spreadsheet. [Doc. 75-8].

[4]     A copy of a spreadsheet lists bonuses for all employees that month, but not CSI scores or composite scores.  [Doc. 75-3].

AO 72A
(Rev.8/8
2)

calculated, was to give the employee an opportunity to prove the error and, if proven, adjust the bonus accordingly. [Doc. 11 at ¶ 33].

Plaintiff's bonus in March 2014 was $640, but he expected to receive about $4,000. [*Id.* at ¶ 28]. Conley calculated Plaintiff's March 2014 bonus on or around April 1, 2014 using CSI scores provided by King for March 2014. [Doc. 80-8 at ¶ 34]. When Plaintiff approached Conley about his bonus, he was invited into Conley's office and told that this bonus amount was based on a low CSI score and 25 percent email capture rate, both of which Plaintiff contends are false, as he later verified with the employee responsible for tracking them, that is, that his scores were "above the threshold set by the dealership[.]" [Doc. 11 at ¶¶ 30, 32, 34-36]. Plaintiff responded that he would obtain proof that the reasons given were false, whereupon Conley allegedly stated "I'm done with you. If you don't like it you can turn in your resignation." [*Id.* at ¶¶ 37-38]. When Plaintiff responded that he "cannot continue to take this kind of treatment," Conley allegedly swore at him and told him to "get the f— out of my lot." [*Id.* at ¶¶ 40-42].

Plaintiff alleges that Aycock, Conley, and Smith subjected him to a hostile work environment (Count I) in the following ways:

6

- made "clicking" sounds at Plaintiff in what he contends was "an attempt to imitate the sounds associated with certain languages of Africa which use click consonants";
- made comments to Plaintiff such as, "Why are you [Africans] all over here? You should stay in the jungle";
- when using the public address system at the dealership, would call out Plaintiff's name by stating "Itchy dicky, no reach around" to humiliate Plaintiff by mocking his Nigerian name, Ikedichi Nwokoro;
- During sales meetings Conley repeatedly used the term "blood diamond" to describe the sales bonuses he was offering to the sales staff and ask Plaintiff to explain the term.  If Plaintiff attempted not to answer, Conley would often insist that Plaintiff explain that he "was referencing the practice killing of Africans for diamonds that were then exported to the west for profit";
- referred to Plaintiff as the "Nigerian Nightmare" "as an attempt to denigrate Plaintiff's national origin";
- Conley referred to Plaintiff as a "f******* African," and stated that "You Africans are not scared of death and will blow yourselves up";
- repeatedly commented, when they received spam messages in their email, that they were receiving emails from Plaintiff's "brothers in Nigeria";
- Smith repeatedly played pranks on employees who came from other countries, and did not play similar pranks on white and American-born employees;
- During the 2012 election, vocally supported Mitt Romney.  On the night of the election, Aycock said "if Obama wins again, I will fire every black person in my department";
- On July 13, 2013, at approximately 11:00 pm, after the night of George Zimmerman's acquittal, Smith sent Plaintiff a photo via text message of a rapper and gang member by the name of "The Game."  The photo depicted an individual with tattoos and gold teeth standing in an intimidating pose.  Smith captioned the photo with "Trayvon Martin";
- In October 2012, Max Barber, Defendant's Chief Operating Officer, said to Plaintiff that he had a property in White County by the lake, and

AO 72A
(Rev.8/8
2)

"you know what White County means – any black person coming over there would be shot";

- In October 2013, Plaintiff was being considered for a promotion and, when he wasn't promoted, Aycock stated that he did not promote Plaintiff because he could not trust Plaintiff because Plaintiff "came from a criminal culture";

- Plaintiff then complained to Conley about Aycock's comment, and Conley did not take any action. Indeed, Conley also used, and relied upon, the statement that Plaintiff came from "a criminal culture" when determining whether to promote Plaintiff and Smith threatened Plaintiff that he could be fired for "no reason";

- In November, 2013, Smith recorded a video of a co-worker standing behind Plaintiff, who was unaware of the co-worker's presence, and using a fake penis to simulate a sex act upon Plaintiff. Smith then sent the video to other Ford dealerships;

- In December 2013, Plaintiff won a sales contest at the dealership. The prize for the contest was a limousine ride to the Georgia Dome to watch a professional football game. During the ride, a radio commercial played a jingle from the movie The Lion King. After hearing the jingle, Erik Conley asked Plaintiff whether the song "reminded him of jungle?";

- After Plaintiff completed a car sale and promised the customer that Mall of Georgia Ford would deliver the truck to the customer's house, Conley stated that Plaintiff would be required to pay $100 to the dealership's delivery drivers to complete the delivery unless Plaintiff sang the song "Proud to Be An American" by Lee Greenwood;

- In early 2014, Plaintiff was in the break room and pouring a cup of coffee when Plaintiff realized the creamer for the coffee was empty. Smith asked why Plaintiff needed creamer, since where Plaintiff came from "people did not have coffee machines let alone creamer";

- On March 22, 2014, without any prompting from Plaintiff, Smith called Plaintiff to Smith's car and showed him his gun, stating, "this is what Republicans carry." Plaintiff believed that Smith was threatening him and was scared to work late because he did not want to be at the dealership alone with Smith;

8

- engaged in harassing conduct directed at other minorities including: Conley repeatedly referring to another co-worker, of Indian descent as a "terrorist"; during a meeting awarding sales prizes Conley asked a white sales representative why he allowed "even this terrorist" to earn more sales than the white employee; Aycock forced another Nigerian employee to read a passage from a book aloud in front of other employees to "prove that [the employee] could speak English" due to a perceived Nigerian accent;
- deprived Plaintiff of access to customers and sales that they did not deny to white employees;
- disciplined Plaintiff more harshly than white coworkers, specifically, during the course of Plaintiff's employee he was involved in a verbal altercation with a white employee. Although management verified with witnesses that the white employee was the aggressor, only Plaintiff was subject to discipline; and
- Defendant's supervisors were aware of and condoned the above[.]

[*Id.* at ¶¶ 58-85].

Plaintiff also alleges that he was discriminated against in violation of 42 U.S.C. § 2000e-2 (Count II). [*Id.* at ¶¶ 86-91]. Specifically, he claimed that, although he was qualified and "met all sales goals and was in compliance with workplace rules at the time of his termination," he was terminated and such termination was "predicated upon . . . Conley wrongfully depriving Plaintiff of a monthly bonus" and Plaintiff's "statement that he 'could not endure this type of treatment.' " [*Id.* at ¶¶ 86-89]. Plaintiff also claimed that he "was treated less favorably than similarly-situated workers outside Plaintiff's protected class" who were not "disciplined

9

or terminated simply for making a passing comment, nor have they had their bonuses wrongfully withheld or reduced." [*Id.* at ¶ 90].

Lastly, Plaintiff claims that he was retaliated against in violation of 42 U.S.C. § 2000e-3 (Count III). [*Id.* at ¶¶ 92-98]. Specifically, Plaintiff claims that Conley learned he had filed an EEOC Complaint on April 2, 2014, he subsequently reduced his monthly bonus and, when Plaintiff contested this reduction, fired him. [*Id.* at ¶¶ 92, 97-98]. Plaintiff also claims that he had previously repeatedly raised issues of racial harassment and discrimination and Defendant told him it "believed he was "attempting to a build a case" and might sue. [*Id.* at ¶¶ 93-96].

## II.   *Legal Standard*

Under Federal Rule of Civil Procedure 37(e):

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

10

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

When the rule was amended in 2015, the advisory committee clarified that, to apply it, the court must decide "whether and when a duty to preserve arose. Courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e), Notes of 2015 Advisory Comm. "The rule applies only if the information was lost because the party failed to take reasonable steps to preserve the information." *Id.* The Advisory Committee Notes continue that

> Because the rule calls only for reasonable steps to preserve, it is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve. For example, the information may not be in the party's control. Or information the party preserved may be destroyed by events outside the party's control. . . . Courts may, however, need to assess the extent to which a party knew of and protected against such risks.

*Id.* The Notes also remind that perfect preservation is not the standard, and courts must look at a number of factors in considering if preservation steps were reasonable.

> [T]he routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information, although the prospect of litigation may call for reasonable steps to

11

> preserve information by intervening in that routine operation. . . .
> The court should be sensitive to the party's sophistication with regard to
> litigation in evaluating preservation efforts; some litigants . . . have
> considerable experience in litigation.

*Id.*  Another factor is proportionality based on party resources and the expense of
preservation.

> It is important that counsel become familiar with their clients' information
> systems and digital data . . . to address these issues.  A party urging that
> preservation requests are disproportionate may need to provide specifics
> about these matters in order to enable meaningful discussion of the
> appropriate preservation regime.

*Id.*

Assuming a party failed to take reasonable steps to preserve electronically stored
information ("ESI") that should have been preserved in the anticipation or conduct of
litigation, and the information is lost as a result, the Court must conclude if the lost
information can be restored or replaced through additional discovery.  *Id.* If the
information cannot be restored, the sanctions allowable vary based on the nature of the
loss, i.e., whether it was intentional or negligent.  As the Eleventh Circuit has
explained, when a party alleges that spoliation of evidence has occurred, a court should
ask whether sanctions -- including adverse inferences and the exclusion of evidence --
are warranted, based on (1) whether the party seeking sanctions was prejudiced and

12

whether any prejudice was curable, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (3) the potential for abuse if sanctions are not imposed. *Tien v. Red Coats, Inc.*, No. 16-12347, 2018 WL 5025240, at *2 (11th Cir. Oct. 17, 2018) (citing *ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)). If ESI has not been preserved, a court may cure any prejudice and, upon finding that the spoliating party acted with bad faith, (1) presume the lost evidence was unfavorable to the spoliating party, (2) instruct the jury that it may or must presume the evidence was unfavorable to the spoliating party, or (3) dismiss the action or enter a default judgment. *Id.*

As Plaintiff has asserted that Defendant's spoliation was both intentional and negligent, the undersigned will address the differing standards and arguments for each.

### III.   *Discussion*

#### A.   **Whether Spoliation Occurred**

##### 1.   **Parties' Arguments**

Plaintiff claims that "the vast majority of the emails associated with" his managers' accounts were deleted because electronic discovery revealed Defendant had no emails in the mailboxes of Conley and Aycock prior to January 1, 2017 or James King prior to January 1, 2015. [Doc. 75 at 6 (citing [Doc. 75-2 at ¶¶ 16-17])]. He

claims that these deleted emails include correspondence between his managers prior to his termination that could reveal: (1) whether Plaintiff's supervisors planned to fire him because they believed he was planning to sue Defendant; (2) whether Plaintiff's supervisors wrongfully deducted income from his monthly bonus in March 2014 or held him to a different standard than similarly-situated co-workers; and (3) whether Plaintiff's supervisors acted with discriminatory intent in terminating him, [*id.* at 3].

Specifically, Plaintiff claims that "it is impossible for Plaintiff to review the raw data Defendant relied upon when calculating CSI scores and bonuses for the month of March 2014 . . . because those CSI scores were stored [sic] the email accounts which Defendant deleted." [*Id.* at 8 (citing [Doc. 69 at 11:25-13:4-10])].  Plaintiff first requested CSI surveys in September 2017. [*Id.* at 9 (citing [Doc. 75-5])].  The only CSI surveys produced by Defendant, on March 29, 2018, were "an incomplete set of Plaintiff's own CSI surveys." [*Id.*].  Plaintiff claims that, because the CSI scores were sent to his manager's email accounts, they "should be stored in each manager's VTAIG.com email account." [*Id.* at 8].  He further contends that, since the emails are missing, he lacks access to complete  CSI information and cannot determine "whether the dealership discriminated against him by lowering his sales bonus, and runs counter

14

to the verification Plaintiff obtained just prior to his termination that he qualified for the CSI bonus." [*Id.* at 9].

Plaintiff claims that Defendant had a "clear duty to preserve" these emails. [*Id.*]. First, Plaintiff claims that Defendant had notice, in October 2013, when he emailed Conley to lodge an internal complaint of general workplace harassment and specific harassment by Aycock, that he was contemplating litigation. [*Id.* at 10 (citing [Doc. 75-1])]. Plaintiff submits that this notice is reinforced by Aycock's belief that Plaintiff was secretly recording conversations to use in a lawsuit against Defendant. [*Id.* (citing [Doc. 71 at 22:16-25])]. Second, Plaintiff claims that Defendant had notice of Plaintiff's intent to litigate on April 16, 2014, when it received a letter from his attorney instructing it to preserve evidence, including emails. [*Id.* at 11 (citing [Doc. 75-4])]. Plaintiff claims that both of these communications were sufficient to trigger Defendant's duty to preserve. [*Id.* at 12].

Moreover, Plaintiff claims that preservation was not unduly burdensome as it involved placing a "litigation hold" on an email account by checking a box on the Microsoft Exchange software interface. [*Id.* at 12-13 (citing [Docs. 75-4, 72 at 16:19-25])]. Normally, Defendant's employees' emails are deleted from the server 30 days after an employee deletes the email from his or her account. [Doc. 75-4 at 13 (citing

15

[Doc. 72 at 12:1-16, 16:7-17, 19:15-22])].  While the parties' briefing does not explain what a "litigation hold" would retain or where it would retain it, in March or April 2015, Berkshire's IT systems head was unaware of any litigation holds on any email account.  [*Id.* at 13 (citing [Doc. 72 at 10:19-25])].

Defendant responds that it complied with the April 2014 preservation request from Plaintiff's attorney, storing everything, including emails, that pertained to Plaintiff or his claims and deleting or discarding nothing that it believed was relevant to the same.  [Doc. 79 at 3].  Furthermore, Defendant contends that, to the extent anything was deleted, it was done so in the context of its routine ESI practices.  [Doc. 79 at 4].

First, Conley declares that, prior to Plaintiff's termination, his practice was to delete old emails from mailbox "to avoid clutter and to make it easier to find emails that are relevant to current matters that he is handling or watching."  [*Id.* (citing [Doc. 79-4 at ¶ 6])].  He explained that, if he believed an email or attachment "may be relevant to a current matter, or important for some other reason, he makes a folder on his computer and copies such emails and documents from his email box to the folder in order to preserve them before deleting them from his mailbox."  [*Id.*].  Conley testified that, when he received the letter on April 16, 2014, he set up a computer folder to store emails pertaining to Plaintiff and the issues identified in the letter and copied them into

16

that folder or sent them to Kathy Miller, Mall of Georgia Ford's comptroller, for filing before clearing out his mailbox.  [*Id.* (citing [Doc. 79-4 at ¶¶ 5, 7-8])].

Second, Defendant explains that the reason all of Aycock's emails were deleted was because he resigned on May 28, 2014 to join a sister company and, "in the ordinary course of operating the electronic information system, Aycock's Mall of Georgia Ford vtaig.com email box was shut down and eventually deleted from the system." [*Id.* at 18 (citing [Doc. 79-4 at ¶ 15])].  Plaintiff replies that this is irrelevant as Defendant had notice in April 2014, at least one month before Aycock resigned and 30 days before any emails Aycock deleted would be removed from the server, that it needed to preserve emails in relation to litigation.  [Doc. 82 at 5].

Third, Defendant explains that, between April 10, 2014 and February 7, 2017: Van Tuyl (and, by extension, the Mall of Georgia Ford) was acquired by Berkshire; all the computer systems were replaced; Defendant discontinued the services provided by Dealer.com (which included the server) and lost emails prior to 2015; the external contractor who serviced computers was replaced by a Director of Information Systems, Nate Lewis ("Lewis"); and, in April or May 2015, the 2007 Microsoft Exchange software was replaced with a 2013 one (eliminating the prior systems' logs showing the dates files were altered or deleted).  [*Id.* at 17 (citing [Doc. 72 at 9:14-10:18, 14:11-25,

17

25:18-26:20])].  Plaintiff replies that any arguments regarding the loss of emails due to the upgrade of the email server are belied by the fact that all old emails were migrated to the new server.  [Doc. 82 at 5 (citing [Doc. 72 9:22-10:18])].

Defendant also argues that it was under no obligation to preserve any records beyond ninety days after the EEOC's issuance of Plaintiff's Notice of right to sue because it "could not anticipate that Plaintiff would bring a claim under 42 U.S.C. § 1981.  His EEOC charge alleged only nationality-based discrimination." [Doc. 79 at 22].  This argument is unconvincing as courts have found the line distinguishing § 1981 race and ethnicity claims and Title VII nationality claims is amorphous.[5]  Lastly, Defendant claims that the reason Conley's and Aycock's email

---

[5]      Section 1981 generally creates a cause of action for discrimination based on race but not for discrimination based on national origin.  *Davis v. Boyle-Midway, Inc.*, 615 F. Supp. 560, 560 (N.D. Ga. 1985) (quoting *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. Unit B 1981) (in turn citing *McDonald v. Sante Fe Trail Transport Co.*, 427 U.S. 273 (1976)); *see also Ndaka v. Gwinnett Hosp. Sys., Inc.*, Civ. Action File No. 1:08-CV-02689-TCB-GGB, 2010 WL 11598161, at *2 (N.D. Ga. Sept. 23, 2010), *adopted at* 2010 WL 11600975 (N.D. Ga. Oct. 18, 2010) (Batten, J.); *Gorman v. G.M. Roberts*, 909 F. Supp. 1493, 1498 (M.D. Ala. 1995).

It has been widely noted, however, that the difference between race (or ancestry or ethnicity) and national origin is not always clear.  *See, e.g., Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring).  The Supreme Court has held that "[b]ased on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic

18

"boxes contain no email data pertinent to Plaintiff or his claims sent or received during

that period between April 16, 2014 and February 7, 2017 is attributable simply to the

fact that neither one received or sent any email that pertained to Plaintiff or his claims

after April 16, 2014, other than" the letters from Plaintiff's counsel, communications

with the Georgia Department of Labor and the EEOC and this current action's

summons and complaint.  [Doc. 79 at 6-7].

### 2.    Analysis

Regardless of intent, "spoliation" refers to "the destruction or significant

alteration of evidence, or the failure to preserve property for another's use as evidence

in pending or reasonably foreseeable litigation." *See Oil Equip. Co. v. Modern Welding*

*Co.*, 661 Fed. Appx. 646, 652 (11th Cir. Sept. 29, 2016) (citations omitted).  The parties

agree that Defendant received notice on April 16, 2014 from Plaintiff's attorney that

he had filed an EEOC charge and was asked to preserve ESI (including emails)

───────────────

characteristics.  Such discrimination is racial discrimination that Congress intended
§ 1981 to forbid. . . ." *Id.* at 613 (opinion of the Court).  It concluded, therefore, that
the plaintiff in *Al-Khazraji* could sustain a claim under § 1981 if he could "prove that
he was subjected to intentional discrimination based on the fact that he was born an
Arab, rather than solely on the place or nation of his origin. . . ." *Id.*  The former Fifth
Circuit has allowed a § 1981 case to go to trial even though it was pleaded as a national
origin claim where it was not clear if the alleged discrimination was based on the
preferred candidates' "Oriental" race or Korean national origin, because the difference
between national origin and race is so difficult to trace.  *Bullard*, 640 F.2d at 632.

19

pertaining to Plaintiff.  Therefore, the duty to preserve arose, at the latest, on April 16, 2014.  Defendant contends that: (1) to the extent that ESI was not preserved, it was in the regular course of its business practice; and (2) it preserved all ESI relevant to Plaintiff's claims.  However, this does not explain the absence of the raw CSI data contained in managers' vtaig.com accounts.

Conley admits that he used CSI data to calculate Plaintiff's bonus around April 1, 2014.  On April 2, Plaintiff had an interaction with Conley where he contested his bonus based on the veracity of the underlying CSI data and was terminated. Therefore, it was reasonable to assume that the data underlying bonus calculations would be relevant to Plaintiff's EEOC charge (and any ensuing litigation).  Moreover, Defendant had the ability to preserve these emails, either on the senders' or recipients' mailboxes or, if they were deleted from the same in the prior 30 days, on the server. The failure of either Conley or, if it was deleted before April 16, whoever was in charge of locating and preserving relevant evidence on the server, to preserve underlying CSI data, given Defendant's regular retention polices, ability to place an email litigation hold, and awareness of possible litigation, is utterly unexplained.  Therefore, there was undisputedly spoliation of raw CSI data, upon which Plaintiff's CSI score, composite score, and bonus were based.

AO 72A
(Rev.8/8
2)

However, this is not the case for unspecified emails sent or received by Conley, Aycock, King or others, that Plaintiff surmises might reveal whether Plaintiff's supervisors: (1) planned to fire him because they believed he was planning to sue Defendant, and (2) acted with discriminatory intent in terminating him. [Doc. 75 at 3]. As Defendant points out, Plaintiff must prove that the missing evidence exists, which he has not done. [Doc. 70 at 13-14 (citing *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 681, 694 (N.D. Ga. Mar. 24, 2016) (Duffey, J.); *Wilder v. Rockdale Cnty.*, 1:13-cv-2715-RWS, 2015 WL 1724596, at *3 (N.D. Ga. Apr. 15, 2015) (Story, J.))]. Defendant notes, and Plaintiff acknowledges, that the existence of these emails is uncertain. [*Id.* at 14 (citing [Doc. 75 at 3 ("the jury must confront three issues which could hinge on the deleted emails")])]. Unlike the emails containing CSI data, which were sent as a routine business practice, neither Plaintiff (nor the Court) can know that these unspecified communications ever existed. As a result, the Court finds no spoliation with respect to unspecified emails.

**B.     Whether Spoliation Was With the Intent to Deprive**

Having determined that spoliation occurred (with respect to CSI data), the question for the Court becomes the appropriate remedy. Plaintiff seeks sanctions for spoliation of evidence under Fed. R. Civ. P. 37(e)(2) in the form of a mandatory,

21

rebuttable presumption whereby the jury is instructed to presume the lost evidence is favorable to Plaintiff.  [Doc. 75 at 18].  Specifically, Plaintiff requests that the jury be instructed to infer that Defendant wrongfully manipulated Plaintiff's bonus, conducted an inadequate investigation of his internal workplace harassment complaint, and decided to reduce his bonus and fire him for discriminatory and retaliatory purposes. [*Id.*].

Courts should "exercise caution[,]" applying these "very severe measures . . . only on a finding that the party that lost the information acted with the intent to deprive another party of the information's use in litigation." Fed. R. Civ. P. 37(e)(2), Notes of 2015 Advisory Comm.  The Eleventh Circuit previously has instructed that, to ascertain intent, "[t]he court should weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005) (citing *Bridgestone/Firestone North American Tire, LLC v. Campbell*, 258 Ga. App. 767, 574 S.E.2d 923, 927 (2002)); *see also Oil Equip. Co. Inc.*, 661 Fed. Appx. at 652 ("To determine whether and what sanctions are warranted for spoliation of evidence, courts should primarily consider the extent of prejudice caused by the spoliation (based on the importance of the evidence to the case), whether that prejudice can be cured, and the culpability of the spoliator.")   Although the

22

amendments to Rule 37 in 2015 partially abrogated *Flury*, courts in the Circuit have applied that analysis to determine whether spoliation was in bad faith. *See e.g. Austrum v. Federal Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1351 (S.D. Fla. 2016); *Creative Movement and Dance, Inc. v. Pure Performance, LLC*, No. 1:16-cv-3285-MHC, 2017 WL 4998649, at *13 (N.D. Ga. Jul. 24, 2017); *Wilder*, 2015 WL 1724596, at *2.

Plaintiff submits that spoliation was intentional because Defendant's discovery conduct reveals "a pattern of hiding evidence" that should be considered in assessing whether its failure to preserve evidence was in bad faith. [Doc. 75 at 14 (citing *Morrison v. Veale*, No. 3:14-CV-1020-TFM, 2017 WL 372980 (M.D. Ala. Jan. 25, 2017))]. Plaintiff argues that this bad faith is evinced by the fact that Defendant did not preserve and withheld or altered the email he sent to Conley in 2013 containing his internal complaint. [*Id.* at 14-15]. First, Plaintiff claims that, in discovery, Defendant only produced a copy of his internal complaint dated June 11, 2014, which it received from Plaintiff during his June 12, 2014 unemployment hearing. [*Id.* (citing [Doc. 75-13])]. Plaintiff appears to claim that handwritten notes were made on this copy after the unemployment hearing. [*Id.* at 15 (citing [Doc. 75-5 at 6-8])]. Second, Plaintiff claims that Defendant redacted these handwritten notes on the copy of the internal

AO 72A
(Rev.8/8
2)

complaint submitted to the EEOC during the EEOC investigation.  [*Id.* at 15 (citing [*id.*] and [Doc. 75-12])].  Third, Plaintiff claims that Defendant initially produced a "covertly redacted" copy of the internal complaint during discovery and it was not until Plaintiff deposed Conley under Rule 30(b)(6) that he discovered that additional documents regarding Plaintiff's internal complaint existed that had not been produced. [*Id.* at 16 (citing [Doc. 66 at 125:23-127:19])].  Conley claimed that he made these notes during his 2013 investigation of Plaintiff's internal complaint, however, Plaintiff claims that this is impossible, as Defendant produced the copy of Plaintiff's internal complaint with those notes during his unemployment hearing.  [*Id.* at 16 (citing [Doc. 67 at 16:1-17:1, 17:20-24, 18:13-21, 21:2-5, 23:17-24:6, 27:16-20, 29:1-6, 31:10-32:7, 33:24-25])].  Fourth, Plaintiff claims that he learned, for the first time, at Conley's first deposition that Aycock had written an email responding to this investigation, which was not produced in response to Plaintiff's discovery requests.  [*Id.* at 17 (citing [Doc. 66 at 127:3-14, 127:24-128:9; Doc. 67 at 35:12-35:11; Doc. 75-5])].

The Court notes that the record contains a March 29, 2018 email from Defendant's counsel (Mr. Caldwell) to Plaintiff's counsel attaching a file containing these records and explaining that they "were not stored in" Conley's email box. [Doc. 75-9 at 1].  Notably, Defendant does not explain where they were stored and why

they were not disclosed prior to Conley's deposition.  [*Id.*].  Additionally, Defendant does not respond to Plaintiff's argument that its failure to produce copies of the internal investigation communications in the normal course of discovery, redaction of the same when sent to the EEOC, or alteration and withholding of them during discovery, constitutes a "pattern of hiding evidence."  [Doc. 79].

There may be reasonable explanations for Defendant's conduct to rebut Plaintiff's claims that it demonstrates a pattern of bad faith, however, Defendant has not offered any.  The Court is not required to make arguments on behalf of a party to litigation, especially a represented party, and it is not inclined to do so in this case.  *See Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1265 n.3 (10th Cir. 2008); *see also Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011) (" '[I]t is not the Court's place to try to make arguments for represented parties.' " (quoting *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 861 (N.D. Ill. 2008))).  As a result, the Court will not conjure up explanations for the discrepancies noted by Plaintiff.

That Aycock and Conley's 2013 email communications concerning Plaintiff's internal complaint were only discovered during Conley's deposition suggests that, contrary to Defendant's assertion, some of Aycock's and Conley's emails were preserved but not produced in response to discovery requests.  Although Defendant's

25

counsel explained that these documents were retained outside email and only discovered later, that explanation lends credence to Plaintiff's claims that, at best, Defendant overlooked evidence responsive to Plaintiff's discovery requests and, at worst, withheld it.  This is troubling.  However, as Plaintiff now has this information, it cannot be said that such evidence was ultimately destroyed or significantly altered so as not to be usable by Plaintiff in this litigation.

The same cannot be said of the CSI data.  Plaintiff submits that the Court can infer that such spoliation was in bad faith because of unexplained discrepancies in Defendant's discovery conduct related to his 2013 internal complaint.  [Doc. 75 at 14].  However, Plaintiff offers  no precedential authority whereby a court inferred bad faith in the failure to preserve ESI solely from unexplained discovery discrepancies regarding other (ultimately produced) ESI.

Admittedly, there is little Circuit guidance to inform Plaintiff's argument, as Fed. R. Civ. P 37(e) was amended in 2015.  However, the Court's own research reveals that, in the absence of direct evidence of intentional spoliation, courts are reluctant to find intentional spoliation where evidence was lost through omission, rather than some affirmative, destructive act.  *See*, *e.g.*, *ML Healthcare Servs., LLC*, 881 F.3d at 1308 (holding that district court did not err by finding that, although Publix only preserved

26

the most relevant portion of the video associated with Plaintiff's fall, there is no indication that the failure to preserve footage of all cameras in its store for 35 days–amounting to 840 hours of footage per camera–was inconsistent with its normal video-retention policies or would have resolved a crucial issue in the case); *Marshall*, 313 F.R.D. at 700-01 (noting that it "is troubling that Defendant's counsel . . . provided information to Plaintiff's counsel–and the Court–which ultimately turned out to be false [and] that [Defendant's chief information officer] was not prepared at his deposition to answer specifically when Plaintiff's computer was reformatted and recycled," but "[t]his does not . . . support that, when Defendant failed to preserve [ESI] Defendant acted in bad faith or with the intent to deprive Plaintiff of the use of that information in this litigation."); *Virtual Studios, Inc. v. Stanton Carpet Corp.*, No. 4:150cv00070-HLM, 2016 WL 5339601, at *3, 10-11 (N.D. Ga. Jun. 23, 2016) (no intentional spoliation although plaintiff "did little, if anything, to prevent the loss of the emails" where it had five separate servers during relevant time period, some of which were no longer accessible). *But see Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D 730, 746 (N.D. Ala. Mar. 9, 2017) (finding that, although there was no direct evidence of an intent to deprive a party of ESI, there was sufficient circumstantial evidence because, after the parties agreed to

27

and instituted a firewall to protect it, it was destroyed by an affirmative act that was not credibly explained); *Wooden v. Barringer*, No. 3:16-CV-446-MCR-GRJ, 2017 WL 5140518, at *10 (N.D. Fla. Nov. 6, 2017) (potential negligence, but not bad faith, where defendant failed to take affirmative action to preserve evidence); *Austrum v. Federal Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1351 (S.D. Fla. 2016) (intentional spoliation where defendant failed to retain plaintiff's job application in contravention of EEOC rule requiring preservation).  While not a hard and fast rule, the Court's analysis is informed by this trend in weighing "the degree of the spoliator's culpability against the prejudice to the opposing party." *Flury*, 427 F.3d at 946.

Here, there is no direct evidence that Defendant intentionally deleted the emails containing CSI information to prevent Plaintiff from using them in litigation.  However, there is circumstantial evidence that the emails containing CSI data were deleted from Conley's and King's email accounts and Defendant failed to retrieve them from the server for preservation.  Assuming these emails were intentionally deleted from Conley's and King's mailboxes, they should have remained on the server for 30 days under the routine, good faith operation of Defendant's retention policy.  But they did not, because they were either intentionally deleted from the server or not preserved within the 30-day period.  As a result the case is distinguishable from *Austrum*–where

28

defendant contravened a regulatory preservation duty, 149 F.Supp.3d at 1351–and *Alabama Aircraft*–where material was deleted despite a firewall, 319 F.R.D at 746. However, unlike *ML Healthcare Servs.*, the spoliated evidence here is crucial to the parties' claims.   881 F.3d at 1308.   The situation seems analogous to cases where judges in this District found no intentional spoliation despite: (1) discovery discrepancies, *Marshall*, 313 F.R.D. at 700-01, and; (2) Defendant "could have taken greater care to preserve the information at issue, and its IT practices appear to leave much to be desired[,]" *Virtual Studios*, 2016 WL 5339601 at *11.   Therefore, although Defendant is culpable of spoliation, it is not to such an extent that the Court can say it was the result of an intentional, destructive act, rather than negligent preservation omissions in tandem with Defendant's ESI system's routine operation and replacement. Having found that culpability is not an overriding factor, the Court turns to the prejudicial effect of the spoliation to determine the appropriate remedy.   *Flury*, 427 F.3d at 946.

## C.      Whether Spoliation Was Prejudicial

If the Court does not find intentional spoliation warrants sanctions under Fed. R. Civ. P. 37(e)(2), Plaintiff argues that it should sanction Defendant under Fed. R. Civ. P. 37(e)(1), because the spoliation prejudiced Plaintiff.   [Doc. 75 at 21].   Plaintiff

AO 72A
(Rev.8/8
2)

requests that such sanctions should be in the form of: (1) excluding all evidence Defendant wishes to introduce concerning the calculation of Plaintiff's CSI scores, email capture rate score, and monthly bonus (and allow the jury to decide based on credibility); and (2) allowing Plaintiff to introduce evidence of Defendant's evidence preservation obligations and failure and to argue that it demonstrates discriminatory intent. [*Id.* at 22].

> Rule 37(e)(1)
>
> applies only if information should have been preserved in the anticipation or conduct of litigation, a party failed to take reasonable steps to preserve the information, information was lost as a result, and the information could not be restored or replaced by additional discovery. In addition, a court may resort to (e)(1) measures only 'upon finding prejudice to another party from loss of the information.' An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation.
>
> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e)(1) Notes of 2015 Advisory Comm.

Here, it is undisputed that emails containing CSI data: (1) were sent to Defendant managers' vtaig.com accounts monthly so that they could calculate employees' bonuses; (2) Conley calculated Plaintiff's March 2014 bonus around April 1, 2014 using a CSI score and composite scores provided by King for March 2014; (3) Plaintiff disputed the veracity of this information on April 2; (4) Conley terminated Plaintiff later that day. [Doc. 80-8 at ¶¶ 28-50]. Plaintiff claims that his March 2014 bonus was incorrect, discriminatory, and retaliatory as it was based on inaccurate data. [Doc. 11 at ¶¶ 87-91, 96-98]. Defendant points to the composite score and overall CSI score to argue that it was not. [Doc. 76-11 at 30].

Plaintiff argues that, without the data underlying the CSI score, he cannot disprove Defendant's alleged non-discriminatory reason for calculating Plaintiff's March 2014 bonus. [Doc. 75 at 9]. Defendant responds that "there is no evidence that any email or documents ever existed under the Company's custody and control that were essential to Plaintiff's prima facie case that have not been produced[.]" [Doc. 79 at 22]. Plaintiff replies that Defendant's "argument is belied by Defendant's motion for summary judgment, which argues that Plaintiff's inability to prove that his bonus was improperly reduced for having a low CSI score is detrimental to his claims." [Doc. 83 at 2].

31

The Court agrees with Plaintiff that Defendant is relying on Plaintiff's purported failure to demonstrate that his bonus was improperly reduced, and that without access the CSI data, he cannot support his arguments that it was and Defendant's legitimate non-discriminatory reason for his termination was pretextual.  Therefore, the spoliation of this data is extremely prejudicial to Plaintiff.  As Defendant has not shown that this information issue is capable of resolution through more discovery, sanctions under Fed. R. Civ. P. 37(e)(1) are proper based on the loss of CSI data.  *See Virtual Studios*, 2016 WL 5339601, at *11 (finding sanctions under Rule 37(e)(1), but not Rule 37(e)(2), when emails were lost as a result of a failure to preserve).

As a result, the Court **GRANTS** Plaintiff's motion **IN PART** and imposes sanctions on Defendant under Fed. R. Civ. P. 37(e)(1).  Defendant is **PROHIBITED** from introducing any evidence, at trial or in any motions, concerning the calculation of Plaintiff's CSI scores, email capture rate score, and monthly bonus, and Plaintiff **MAY** introduce evidence of Defendant's evidence preservation obligations and failures and to argue that those failures demonstrate discriminatory intent.

### D.    Attorney's Fees Incurred in Discovery Due to Spoliation

Finally, Plaintiff asks the Court to award it "costs and attorney's fees related to time spent by his lawyers litigating the issue of spoliation, including conducting

32

repeated depositions, briefing this motion, and other research and investigation necessitated by Defendant's willful disregard of its duty to preserve evidence." [Doc. 75 at 24].  Plaintiff states that courts routinely award such fees, and "there are numerous sources under which a Court may award fees for conduct during discovery including Rule 37(e)[.]"  [*Id.* at n.4 (citing *Carter v. Butts Cnty., GA*, No. 5:12-cv-209-LJA, 2016 WL 1274557, at *10 *M.D. Ga. 2014); *Abdulahi v. Wal-Mart Stores, E., L.P.*, 76 F. Supp. 3d 1393, 1398 (N.D. Ga. 2014); *Swofford v. Eslinger*, 671 F. Supp. 1274, 1289 (M.D. Fla. 2009))].  Defendants do not address this argument. [*See* Doc. 79 *passim*].

The Court observes that nothing in Rule 37(e) discusses the award of fees. Rule 37's other sections explicitly provide for the payment of expenses, including attorney's fees, in the event of motions: compelling discovery, Fed. R. Civ. P. 37(a)(5); for failure to adhere to a court order, Fed. R. Civ. P. 37(b)(2)(C); for a failure to disclose or supplement an earlier response or admit, Fed. R. Civ. P. 37(c)(1)(C) and (2); or attend a party's own deposition, answer interrogatories, or respond to a request for inspections, Fed. R. Civ. P. 37(d)(3).  However, Rule 37(e) is silent as to the award of expenses in the event of a failure to preserve ESI.  Nevertheless, judges in this District have awarded expenses, including attorney's fees, for failure to preserve ESI.  *See*

33

*Abdulahi*, 76 F. Supp. 3d at 1398; *cf. Coward v. Forestar Realty, Inc.*, No. 4:15-cv-245-HLM, 2017 WL 8948347 at *9 (N.D. Ga. Nov. 30, 2017); *Marshall*, 313 F.R.D. at 699; *Wilder*, 2015 WL 1724596 at *5.

Here, the Court finds that spoilation occurred that prejudices Plaintiff and the prejudice cannot be remedied with additional discovery.  As a result, the Court will award Plaintiff expenses, including attorney's fees for this motion.  However, Plaintiff also asks for fees related to other discovery disputes, "litigating the issue of spoilation, including conducting repeated depositions, . . . and other research and investigation necessitated by Defendant's willful disregard of its duty to preserve evidence." [Doc. 75 at 24].  Without knowing more about such what necessitated these depositions and investigations and what they consisted of, the Court is unwilling to issue an order awarding expenses and fees on such an amorphous basis.  Therefore, the Court **GRANT**S Plaintiff's request for expenses and attorneys fees incurred in the current motion for spoilation and **ORDERS** the Plaintiff to submit itemized billing statements supported by affidavits or and declarations **within 10 days** from entry of this Order. The Court **DENIES** Plaintiff's request for expenses and fees associated with "litigating the issue of spoilation, including conducting repeated depositions, . . . and other research and investigation necessitated by Defendant's willful disregard of its duty to

34

preserve evidence." [Doc. 75 at 24].  Defendant shall have **10 days** from the filing of Plaintiff's brief to file a response, and Plaintiff shall have **7 days** from the filing of Defendant's response to file a response.

### *IV.   Conclusion*

For the aforementioned reasons, the Court **GRANTS IN PART** Plaintiff's Motion for Spoliation Sanctions, [Doc. 75], and imposes sanctions on Defendant under Fed. R. Civ. P. 37(e)(1) in the form of **PROHIBITING** Defendant from introducing any evidence, at trial or in any motions, concerning the calculation of Plaintiff's CSI scores, email capture rate score, and monthly bonus.  Plaintiff **MAY** introduce evidence of Defendant's evidence preservation obligations and failures and to argue that it demonstrates discriminatory intent.  The Court also **GRANTS** Plaintiff's Motion **IN PART** and **AWARDS** him expenses and attorney's fees incurred in the presenting the current motion, but **DENIES** the motion with respect to any other expenses and fees. Plaintiff is **ORDERED** to submit itemized billing statements, supported by affidavits or declarations **within 10 days** from entry of this Order.

**IT IS SO ORDERED**, this the ___22nd___ day of December, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)